630 So.2d 1289 (1994)
J.B. RYLAND, Sr., Individually and as Natural Tutor of his Minor Daughters, Joy Belinda Ryland and Katie Sue Ryland
v.
LIBERTY LLOYDS INSURANCE COMPANY, et al.
No. 93-C-1712.
Supreme Court of Louisiana.
January 14, 1994.
*1291 Hon. Richard P. Ieyoub, Atty. Gen., New Orleans, Raymond B. Landry, David P. Spence, Provosty, Sadler & deLaunay, Alexandria, for applicant.
Darrel D. Ryland, Joseph B. Treuting, Marksville, for respondent.
ORTIQUE, Justice.[1]
In this wrongful death case, the trial court found the roadway in a defective condition. Hence, it found the State of Louisiana, through the Department of Transportation and Development (DOTD), primarily at fault and held it primarily liable for the death of plaintiffs' wife and mother, Karen M. Ryland, whose northbound vehicle was struck by a southbound vehicle after it crossed the center line into Ryland's lane of travel. The trial court found the driver of the southbound vehicle 25% at fault for crossing the center line, and the DOTD 75% at fault for the defective condition of the roadway and for its deficient inspection and repair system. The court of appeal affirmed. On the DOTD's application, we granted writ to examine whether plaintiffs proved the automobile accident resulted from a roadway defect which presented an unreasonable risk of harm and, if so, whether its defective condition was a cause in fact of the accident. We conclude the evidence advanced at trial did not substantiate that the roadway traveled by the southbound vehicle, the segment of the southbound lane preceding the point of impact, was defective or unreasonably dangerous. Hence, the DOTD did not breach the duty it owed to both the south and northbound vehicles to maintain in a reasonably safe condition the portion of the roadway traveled by the southbound vehicle. Finding the DOTD not responsible for the accident, we reverse the allocation of fault assessed against it.

FACTUAL AND PROCEDURAL HISTORY
J.B. Ryland, Sr., filed suit on his own behalf for the wrongful death of his wife, Karen M. Ryland, and as natural tutor for their minor daughters, Joy Belinda and Katie Sue. Henry W. Lucas, III; Henry W. Lucas, II; Rita Folse; Liberty Lloyds Insurance Company; the DOTD; General Motors Corporation and two unknown insurers were made defendants. Plaintiffs voluntarily dismissed their claim against General Motors. Folse, Lucas II, Lucas III and Liberty Lloyds settled with plaintiffs prior to trial.[2]
The factual circumstances surrounding the death of Karen Ryland are as follows: After working the 3:00 to 11:00 p.m. nursing shift at Humana Hospital in Marksville, Ryland was on her way home, driving north on Louisiana Highway 107 (LA 107) out of Marksville towards Effie in Avoyelles Parish. At approximately 11:30 p.m. on August 22, 1988, Ryland's northbound 1985 Chevrolet Blazer was in the curve near mile post 43 when a southbound 1984 Chevrolet Chevette driven by Debbie K. Flint approached the curve. Flint's vehicle crossed the center line and struck Ryland's vehicle one-third into the northbound lane. The collision was nearly head-on. The impact gouged the asphalt in the northbound lane. After the impact, Flint's vehicle continued southbound a short distance, veering back into the southbound lane, gouging it in spots. Flint's vehicle came to rest on the shoulder of the southbound *1292 lane just beyond an asphalt overlay patch which was several feet long, a few feet wide and located at the road's edge. The impact spun Ryland's vehicle around so that it also came to a stop south of the point of impact, approximately 20 feet from the road and in a ditch. Ryland's Blazer caught on fire and became engulfed in flames. Once the fire was extinguished and the vehicle towed onto the surface of the highway, the charred remains of Ryland were found inside.
Emergency personnel pronounced the eighteen year old driver of the southbound vehicle, Flint, dead upon their arrival to the scene. The Chevette Flint had been driving belonged to her fiancee, Henry W. Lucas, III. Flint had borrowed it from him a few weeks before the accident. She had moved to Marksville four to six weeks earlier and had driven that portion of LA 107 approximately 10 to 15 times after her move, but allegedly never at night. At the time of her death, Flint was enroute to her apartment in Marksville. She was a half hour late for her rendezvous with her fiancee. Her body was found slumped over the steering wheel, with her hands down toward her lap. A hair brush was near her hands.
The only defendant remaining in the suit at trial was the DOTD. At the close of the one day bench trial held on September 4, 1991, the trial court took the case under advisement. Thereafter, judgment was entered on January 29, 1992, in favor of the plaintiffs in the amount of $1,175,000.
The trial court's written reasons for judgment indicate it was not impressed by either the expert witness called by plaintiff or the one called by the DOTD, but it was impressed by the testimony of the lay witnesses and by the photographs of the accident site. The trial court noted these lay witnesses, local residents and plaintiffs' relatives, attested that the road was notorious for potholes and cracks and that all who travelled LA 107, were afraid of the stretch of the road near the accident site and experienced some difficulty in negotiating that stretch of the highway.
The road showed no signs of skid or yaw marks by either vehicle, indicating to the court that no evasive action was taken by Ryland's vehicle. Ryland's lack of attempt to avoid the accident led the court to,
the inescapable conclusion that the Flynt [sic] vehicle entered the Ryland lane of travel on an extremely sudden basis and entered the point of impact. A viewing of the photographs, as well as the testimony of the witnesses, convinces this Court that the road surface was so severe as to either throw the Flynt [sic] vehicle into the Ryland lane or so severe that, when confronted with imminent impact, Ms. Flynt [sic] attempted to avoid the road hazard and went into the Ryland lane. The cracks in the roadway at the center line were of such severity that, even if Ms. Flynt [sic] would have tried to drive around the hazard, when her tires reached the center line, her vehicle would have been pulled, somewhat, into the Ryland lane. The road's effect on the Flynt [sic] vehicle was made all the more dramatic by the vehicle's small size.
The trial court noted the State has an obligation to adequately insure the safety of drivers by maintaining a system to detect roadway deterioration and to repair such deterioration, but found such a system nonexistent in Avoyelles Parish.[3] Finding the roadway severely blemished, the trial court concluded the State had actual or constructive knowledge of its disrepair.[4] The court, *1293 therefore, held the roadway at the accident site was substandard and posed a danger to motorists; held the State was negligent in not having an adequate system for the allocation of repairs of this defective roadway; and held this defective roadway was the cause in fact of the accident. Nevertheless, concluding that Flint should perhaps have exercised more caution than she did, the trial court assessed her 25% fault and the DOTD 75% fault.
The DOTD suspensively appealed. The Third Circuit affirmed the damage award and the allocation of fault, with Stoker, J., dissenting with reasons. Ryland v. Liberty Lloyds Ins. Co., 617 So.2d 583 (La.App. 3d Cir.1993). The appellate court found plaintiff proved the following four elements entitling it to the recovery of damages from a public entity as per LSA-R.S. 9:2800: 1) the DOTD owned or had custody of the thing which caused the damage; 2) the thing was defective in that it created an unreasonable risk of harm to others; 3) the DOTD had actual or constructive knowledge of the defect or risk of harm, but failed to take corrective action within a reasonable time; and 4) causation.
Like the trial court, the court of appeal concluded the lay witnesses' testimony on the condition of LA 107 at the accident site outweighed the expert witnesses' testimony as to the factors that caused the accident. 617 So.2d at 587. It found "the roadway in question was notorious for potholes and cracks that ran both horizontally and vertically with varying lengths, widths and depths." 617 So.2d at 586. While acknowledging that the DOTD does not have an obligation to maintain perfect roadways, the appellate court agreed with the trial court that the DOTD had a defective inspection and maintenance system which constituted proof of 1) its actual or constructive knowledge of the defect, and 2) its failure to remedy the defect within a reasonable time. 617 So.2d at 588. It also validated the trial court's finding that the defective roadway was a cause in fact of the accident, stating the "accident would not have occurred if there had not been defects in LA 107 at the accident site which existed for a long period of time." (emphasis added) 617 So.2d at 589.[5] In contrast to this judgment, the dissenting judge contested the finding of causation declaring, "[a]ll that plaintiffs showed was a possibility" that the condition of LA 107 was a cause in fact, and concluding "[t]his is a case of no facts to support a finding of cause in fact." 617 So.2d at 591 and 591-592.
On the DOTD's application, we granted certiorari to determine whether plaintiffs proved the DOTD breached the duty it owed to Ryland to maintain the stretch of the southbound lane traveled by Flint's vehicle in a reasonably safe condition and, if so, whether the breach was a cause in fact of the accident. Ryland v. Liberty Lloyds Insurance Company, 625 So.2d 1049 (La.1993).

PROOF ON RECORD
The general testimony about the roadway preceding the accident site, southbound LA 107 approaching the curve near mile post 43, indicated it had once been a concrete road which had been widened. The concrete road was overlaid with asphalt which extended approximately 3 feet onto the former shoulders of both the north and southbound lanes. Thus, the overlaid expansion area at the edge of the lanes, i.e., the 18 to 20 inches along the edge of the asphalt roadway, was not supported by concrete. The expansion area in the southbound lane tended to sink about one-half to one inch. This sinkage created a *1294 fracture line parallel to the edge of the road which was punctuated by cracking, splitting or buckling. The surface of the southbound lane also had occasional perpendicular fracture lines and a fracture line near and parallel to the center line.
Official investigation photographs of the accident scene reveal a sizeable asphalt overlay patch in the southbound lane, across from the point of impact. This asphalt patch was several feet long, sunken and the width of the expansion. It was on a portion of the southbound lane which Flint's vehicle could not have traversed because the physical evidence, the gouging at the point of impact, proved Flint's small vehicle was not in the expansion portion of the southbound lane at that point in the road, but rather was one-third into the northbound lane. See R-3, R-9.[6] Official investigation photographs validate the existence of two small holes or potholes which Flint's vehicle might have traversed on the night of the accidentone approximately 10 feet north of the point of impact and the other approximately 100 feet north of it. See R-2, R-6 and R-9.
Since the night of the accident, portions of the surface of the roadway in the vicinity of mile post 43 have been overlayed. DOTD records reveal that, on November 8, 1988, two large asphalt overlay patches were placed in the southbound lane, extending from the center line to the road's edge. One is situated 100 feet or so north of the accident site, and the other one starts immediately south of the small pothole pictured in R-2 and continues approximately 60 feet south past the point of impact. See DOTD-6C, DOTD-6F, DOTD-6G. Thus, the pothole located approximately 10 feet north of the point of impact had not been filled or overlayed prior to trial.
Trial testimony and pre-trial interrogatories reveal no known citizen complaints about roadway defects on LA 107 in the vicinity of mile post 43 for the years 1986 through 1991. Further, no other accidents have occurred on this portion of southbound LA 107, although there was one northbound single-car accident on LA 107 south of the curve. This nonexistent complaint history and low accident rate existed despite the vicinity's average daily traffic count, tallied for both the north and southbound lanes as follows: 1985-2750 vehicles; 1986-no data; 1987-2160 vehicles; 1988-2920 vehicles; XXXX-XXXX vehicles; and XXXX-XXXX vehicles.
At trial, to establish the DOTD's liability, the Rylands called as their witnesses: a mechanical engineer, two employees of the DOTD, one of the two Louisiana State Troopers who investigated and photographed the accident scene, a deputy sheriff hired by plaintiffs to photograph the scene, Flint's fiancee and several local residents. To refute its liability, the DOTD called the other Louisiana State Trooper who investigated the accident and a civil engineer.
Flint's fiancee, Henry W. Lucas, III, testified that he occasionally travelled LA 107 prior to the accident. Speaking about the southbound lane near mile post 43, he told the Court that, "right before the curve of the accident, there's a bad place in the road." He described the big pothole as being 3 feet by 2½ feet, he tried to go around this spot. He said it "was like a very bad pothole and when I hit it before, it would send my car to the left. You had to be paying attention." He testified that when he viewed the area 3 days after the accident, the bad pothole was covered with asphalt. He admitted that he did not know whether the pothole had been filled prior to the accident. When he viewed photograph R-6, taken by a state trooper the morning after the accident, he identified this "bad pothole" as the dark spot on the edge of the roadway shown in the photograph. As a point of reference, we note that this patched pothole is on the expansion section of the southbound lane, almost directly across from the point of impact. Flint's vehicle could not have traversed it. See R-1, R-3, R-10.
Plaintiffs' second witness was Diane Ryland, a court reporter and sister-in-law to plaintiff J.B. Ryland. A life-long resident of the area who daily traveled LA 107, she testified that the condition of the roadway *1295 prior to the accident was bad "simply because of the overlay, the splitting and the cracking ..." To avoid the roughness, she testified she had to slow down or compensate by driving near the center line. She, too, described a large pothole in the road that she tried to avoid because she did not want to ruin the tires of her car. When her 1986 Thunderbird, the mid-sized car she was driving in 1988, would hit the large pothole she said it "would get thrown a little bit." She indicated her memory was vague, but she thought she remembered more than one pothole. Describing the cracks and uneven areas, she said they ran parallel to the edge of the roadway, before and through the curve. She drove to the center to avoid the crack. These road conditions, however, never caused her to lose control of her vehicle or to cross the center line. She indicated that the condition of the roadway around the curve is "pretty much the same" as the rest of LA 107 throughout Rapides and Avoyelles Parishes. She testified she did not know the particular spot where the two cars collided.
The Louisiana State Trooper plaintiffs called was Trooper Wayne Riche. He said Trooper Anderson was the primary investigating officer of the accident, but indicated they both took photographs on the night of the accident and on the following morning. He conceded that their investigation did not include an in-depth investigation to determine whether the roadway's condition was a contributing factor to the accident. On the many occasions he had driven LA 107 prior to the accident, he had noticed the roadway's unevenness which he attributed to the cracking which ran parallel and perpendicular to the edge of the road. Sometime after the accident, he observed a small, shallow pothole which he identified for the court in photograph R-6. He testified that the photograph was taken from a vantage point approximately 100 feet north of the point of impact, and he circled the pothole which is shown about 10 feet north of the large asphalt overlay patch located opposite from where the vehicles impacted in the northbound lane.[7] When asked by plaintiffs' counsel *1296 whether he had to veer around this area to avoid the pothole, Trooper Riche responded, "I never had any problems in the area." Furthermore, he did not consider the road's condition hazardous to most motorists. But, in response to plaintiffs' queries, he conceded that if he were filling out the accident report today, he would probably indicate the "bumps" in his accident report, i.e., the small pothole and the unevenness of the road surface. He also might indicate on the report that the conditions of the roadway were a contributing factor.[8] Nevertheless, he stated he definitely would leave the violation of Flint as the primary factor of the accident.
Glenn Martin Ducote, the 44 year old owner of Moncla Auto Sales and Salvage and a lifelong resident of the area also testified for plaintiffs about the highway's condition in 1988. He said he traveled the road daily and considered it to have a "couple of bad spots." He described the road as having cracks and unevenness where the road surface buckled up. He described buckles extending across the road in the area preceding the curve. He testified that he would go around the worst spot where it was rough and uneven, veering his car into the other lane. However, on cross examination, he admitted he would not cross the center line if another car was approaching. Rather, he would drive through the bad spot, never losing control of his vehicle even when hitting those holes and cracks. Near the close of his testimony, Mr. Ducote disclosed that he did not actually know where the two cars impacted. The place he described as the point of impact was near where Ryland's car burned, south of the point of impact. We recognize his testimony shows he was unaware that the sizeable asphalt overlay patch was opposite the collision site and, therefore, could not have been traversed by Flint.
Detective Kenneth Smith, an Avoyelles Parish Deputy Sheriff, did not testify in his official capacity. He related to the court that, on October 12, 1988, at plaintiffs' attorney's request he visited the accident site. See generally R-12 through R-19. He observed the condition of the southbound roadway, approaching the curve, and described it as having a 2 or 3 inch wide crack running parallel 18 to 20 inches from the edge of the road. He said this expansion area was lower than the remaining portion of the roadway. He compared it to a gully. When he encountered it, his car would veer to the right, so he would have to veer the car to the left. He also described cracks running across the roadway and several potholes. See R-12.[9] He said that at the time of the accident, he was driving a Chevrolet Camaro Z-28. To miss the potholes, he would either enter into the middle portion of the road or slow down if there was oncoming traffic. He admitted, however, that on the occasions he drove over the rough areas, he never lost control of his vehicle. He believed the road's condition in 1988 was dangerous and the danger was greater for small cars. Nonetheless, he did not report this hazardous condition to the DOTD or to the Louisiana State Police because *1297 it was not his jobhe said the Louisiana State Police pass that area practically every day like he did.
While Detective Smith initially had informed the court that he knew where the cars had impacted, when pointedly questioned, it was revealed he believed the point of impact occurred near the burned trees located 10 to 15 feet south of where the automobiles actually impacted. See R-19.[10] Accordingly, we discern that when Smith testified about the very large pothole and bad expansion area he claimed he veered to avoid, see R-17 and R-18, he was describing the stretch opposite the genuine point of impact, where Flint's vehicle could not have traversed.
Lulie Diane Ryland Bordelon, the younger sister of plaintiff J.B. Ryland, also testified. A life-long resident of Effie, she told the court she drives LA 107 three or four times a week. She testified that she always slows down as she approaches the curve. In 1988, she felt the cracks along the side of the road, which ran through the curve, were dangerous. The cracks ran both parallel and perpendicular to the road. She would drive to the left, which would place her near the center line. But she never crossed the center line, even while driving her Lincoln Continental. Nor did she ever lose control of her vehicle while traversing the area. She viewed photograph R-16 and indicated that the cracks pictured were the cracks she slowed down for or tried to avoid. She considered the curve dangerous because of the roughness experienced all the way through the curve. In clarification, we note R-16 presents a view of LA 107 taken from a vantage point south of the point of impact looking north. The dark patched area in the photograph is across from the point of impact and the foreground was not an area traveled by the Flint vehicle.
Roderick Vidrine, the highway asphalt maintenance foreman for the DOTD's Avoyelles Parish Maintenance Unit since 1987, testified his primary job function is to asphalt the highways in Avoyelles Parish.[11] Vidrine testified his work records reflect that a few months after the accident, his crew patched the road surface of LA 107 in two spots somewhere between mile post 39-41 and 43-12. The daily work report for November 9, 1988, indicates his crew used 15 tons of asphalt and 25 gallons of cationic, a tar-like substance which tacks the asphalt to the road surface to make the two patches which extended from the edge to the center line of the southbound lane. He testified he did not consider 15 tons of hot mix a substantial overlay job; the work took his crew only 4 hours.
Lawrence D. Adams, the Avoyelles Parish Maintenance Superintendent, testified he supervises three foremen, one of whom is Vidrine. He testified that once every 2 weeks, he drives the 367 miles of parish roads to inspect them for road and shoulder defects. Thus, during the two weeks prior to the accident he would have inspected LA 107 near mile post 43 and determined it to be in at least fair condition. The day after the accident, he went to the scene to verify the curve road signs were in place, to look for *1298 road damage and low shoulders, and to photograph the roadway. He testified that he did not recall seeing any potholes, cracks etc. His report did not indicate any shoulder or road unevenness or any defects in the roadway. Instead, his report affirmatively stated "no roadway defects," which he said did not imply the roadway had no cracks or wear and tear. Rather, it meant there were no dangerous defects in the roadway which required routine maintenance at that time. He also informed the court that, prior to the accident, the DOTD did not receive any complaints from citizens or from law enforcement agencies concerning the condition of the roadway.
Plaintiffs' expert witness, Stephen Killingsworth,[12] testified he inspected the accident scene on 3 occasions between January 1991 and the day of trial. When he was shown the photograph R-9, which pictures the Flint vehicle in its final resting spot, he concluded its tires were turned sharply between 30 and 45 degrees. This sharp rotation of the tires indicated to him that immediately prior to the accident, Flint had been involved in a quick, reactionary type movement. Since there were no skid marks, he considered the movement was fairly instantaneous. Rather than simply driving across the center line, he believed a defective condition of the roadway triggered Flint's vehicle crossing the center line. He found a series of "voids" in the road, openings in the roadway that varied in length and in width, and ran along a crack approximately 2 feet inside the road surface. Some voids were patched and others were unpatched. He believed Flint either reacted violently to a "void" and tried to regain control of her car, or felt a rough area and tried to avoid the next rough area which was 50 to 100 feet down the road.[13] Under either scenario, he found the road surface contributed to or triggered her crossing the center line. Hence, he believed the roadway was hazardous.
Killingsworth based his determination that the roadway was hazardous on the road's uneven surface either imparting forces on the vehicle for which the driver had to compensate, or providing forces on the vehicle which the driver reacted to when approaching the next rough patch. He admitted that both his theories were based on Flint overreacting, as the road's conditions were not sufficient to divert her vehicle and force it across the center line.[14] He also admitted he had no *1299 evidence that Flint's Chevette traveled across the voids in the expansion portion of the southbound lane, pictured in R-2. We note that R-2 views LA-107 from south of the point of impact, with the point of impact in the foreground and the portion of the southbound lane traveled by Flint in the background.
In its defense, the DOTD called Louisiana State Trooper Douglas Andrew Anderson. Trooper Anderson, a life-long resident of Avoyelles Parish, informed the court that since 1981, he has investigated about 2,000 accidents. Along with Trooper Riche, he investigated and photographed the Ryland-Flint accident. See generally R-1 through R-11. Using the photographs, Trooper Anderson identified for the court the point of impact and the path taken post-impact by Flint's vehicle which was labeled "veh # 2" on the road's surface. He determined the vehicles hit headlight to headlight, nearly head-on. He found no evidence of skid or yaw marks. Based upon the amount of damage to the vehicles and the distance they traveled after impact, he estimated both vehicles had been traveling at 55 m.p.h. Following his investigation, he concluded "the driver of vehicle No. 2 [Flint] was inattentive or distracted for some reason and crossed the center line and struck vehicle No. 1 [Ryland]." Contrary to Killingsworth's conclusions, Trooper Anderson found no physical evidence of a sharp turning maneuver into the northbound lane on the part of Flint's vehicle. He said the pavement was dry and he checked visibility and confirmed it was unobscured in the southbound lane from a distance prior to the accident site. He testified he searched for, but did not observe, any conditions on the pavement surface north of the point of impact that he felt could have contributed to causing Flint's vehicle crossing the center line. Trooper Anderson reaffirmed the conclusions of his accident report that the primary factor or cause of the accident was Flint driving left of the center line, and the secondary factor was Flint being inattentive or distracted.[15]
On cross examination, Trooper Anderson was shown photograph R-2 for him to identify the cracks which run parallel to the edge of the southbound lane and the potholes shown in the southbound lane north of the point of impact. He testified he is certain he observed those road irregularities during his investigation, but he did not presently recollect seeing them. He conceded to plaintiffs' counsel that the combination of the pictured pothole, the transverse cracks and the parallel cracks, possibly could be factors which might be a hazard to a person driving a small vehicle who is not familiar with the roadway. Nevertheless, when asked if, with hindsight, he would now indicate on the accident report that the road condition was "bumpy," Trooper Anderson responded he would not.[16] He maintained that he did not feel the roadway *1300 surface had anything to do with Flint crossing the center line of LA 107.
The DOTD's expert witness, John Michael Mounce, was accepted by the court as an expert in traffic engineering, highway design and accident reconstruction.[17] He testified that based upon the troopers' photographs, Smith's photographs and his own inspection and photographs, he saw nothing "on the roadway that would constitute a defect of significant degree which would influence vehicle stability in traversing [the roadway] at prevailing highway speeds." See generally DOTD-6A through DOTD-6G, taken August 22, 1991. Based on his familiarity with the results of vehicle stability tests made with small cars, he found no defects which would cause a vehicle to traject out of the southbound lane, or create an out-of-control situation. Further, he found no evidence of an over-corrected steering maneuver. He disagreed with Killingsworth's opinion that Flint would have veered to the center to avoid the next patch of road irregularities. He stated that the normal pattern of avoidance is to the shoulder which is a safe area. He found no significant elevation difference between the expansion area and the road's main surface, finding only one-half inch to an inch difference in its vertical face. He opined that if Flint drove straight, driving through the tangent and not reacting to or making any steering adjustments to accommodate the curvature of the road, she would have driven through the point of impact. In explanation of why Ryland did not show a defensive reaction, Mounce testified that since she was in the curvature of the road, or coming around the curve, she may not have perceived that Flint's approaching car had entered into her lane.

LEGAL PRECEPTS
The State, through the DOTD, is not a guarantor of the safety of travelers. Sinitiere v. Lavergne, 391 So.2d 821 (La. 1980). Rather, the duty the DOTD owes is to keep the highways and its shoulders reasonably safe. Id. The DOTD is held liable when it breaches this duty, where the roadway at the scene of the accident was in an unreasonably dangerous condition. Hunter v. Dept. of Transp. and Dev. of State of La., 620 So.2d 1149 (La.1993); Manasco v. Poplus, 530 So.2d 548 (La.1988); Myers v. State Farm Mut. Auto Ins., 493 So.2d 1170 (La. 1986).
Liability based on the theory of negligence is imposed on the DOTD when it is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time. Sinitiere v. Lavergne, supra.; LSA-C.C. art. 2315. Liability based on the theory of strict liability is tempered by the requirements of LSA-R.S. 9:2800[18] which, as a prerequisite, demands proof that "the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so." LSA-C.C. art 2317; LSA-R.S. 9:2800(B). Under both theories, the duty owed is the same. Liability hinges on whether the DOTD has breached the duty it owes to the plaintiff to keep the roadway at the scene of the accident in a reasonably safe *1301 condition. Hunter v. Dept. of Transp. and Dev. of State of La., supra; Myers v. State Farm Mut. Auto Ins., supra. Whether the DOTD breached this duty depends upon the particular facts and circumstances of each case. Manasco v. Poplus, supra; Myers v. State Farm Mut. Auto. Ins. Co., supra.
The DOTD's duty to maintain reasonably safe highways encompasses persons foreseeably placed in danger by an unreasonably dangerous condition. Sinitiere v. Lavergne, supra. Thus, the duty to keep the roadway at the scene of the accident in a reasonably safe condition extends to the drivers and/or passengers in other vehicles who are likely to be injured when a driver of a vehicle encounters a negligently maintained roadway and goes out of control. See Id. Consequently, both Ryland and Flint were within the ambit of the DOTD's duty to maintain southbound LA 107 in a reasonably safe condition.

APPLICATION OF LEGAL PRECEPTS TO THE EVIDENCE
Applying the foregoing criteria, we find the DOTD is not liable to plaintiffs. Although the portion of the highway traveled by Flint was not in a perfect state of repair, its ordinary deterioration from wear and use did not render it unreasonably dangerous. Plaintiffs' evidence was legally insufficient to prove the DOTD breached its duty to keep the roadway in a reasonably safe condition and to prove the condition of the roadway caused Flint's vehicle to cross the center line. Thus, the lower courts erred in concluding the portion of southbound LA 107 traveled by Flint was in a hazardous condition and its defective condition was a cause in fact of the accident.
While showing the road's surface had signs of wear such as cracks or fracture lines and occasional holes, plaintiffs' evidence did not prove these signs of wear and usage caused the stretch of road traveled by Flint to be unreasonably dangerous. The photographs introduced into evidence by plaintiffs showed the surface of the southbound lane preceding the point of impact in relatively good condition. Admittedly, the road's surface is blemished. Within the 100 feet north of the point of impact, the southbound lane has a few small holes at the fracture line which runs parallel to the road edge where the old highway was expanded. This evidence, however, provides no support for the trial court finding the road's surface was severe enough "to throw" Flint's vehicle into the northbound lane.[19] The evidence did not even insinuate it was physically possible for such an accident to occur, i.e., Flint's vehicle trajecting into the northbound lane at the point of impact without Flint having any opportunity to respond to the emergency situation, as suggested by the trial court, if Flint struck either the hole 100 feet north or the hole 10 feet north of the point of impact, or any of the other horizontal or vertical cracks in the surface of the southbound lane. See R-2, R-6, R-16.
Trooper Anderson, the primary investigating officer of the accident, examined the road's surface after the accident, albeit not to the exacting level of plaintiffs' scrutiny. He found nothing noteworthy about the condition of the surface of the southbound lane preceding the accident site. Nor did he find any conditions which could have contributed to the accident. The photographs support these conclusions. Trooper Riche, who testified on the plaintiffs' behalf, indicated he did not consider the roadway hazardous. He confirmed the hole located 10 feet north of the point of impact was relatively shallow in depth and not large in diameter. See note 7.
Testimony adduced by plaintiffs which fleetingly indicated the southbound lane *1302 could not be traveled safely, when clarified and taken in the context of where the witnesses incorrectly believed the point of impact occurred, was not proof that the portion of the road traveled by Flint was difficult to negotiate, much less "so severe as to throw" Flint's vehicle into Ryland's lane of travel as determined by the trial court. See R-2, R-6. When the lay witnesses testified about the "notorious condition" of the roadway, those witnesses presupposed the Flint vehicle either traversed or intentionally eluded the "large pothole" they identified as the asphalt overlay patch opposite the point of impact. See R-1, R-3, R-10. Cross examination revealed that Lucas, Smith and Ducote believed the automobiles impacted across from where Ryland's vehicle burned, south of the point of impact and further through the curve. Diane Ryland did not know where the accident occurred and Diane Bordelon's testimony did not address the topic. Therefore, none of the lay witness testimony could establish the condition of the portion of the southbound lane which Flint would have traversed immediately before entering the northbound lane.
Their lay testimony also did not establish that Flint's car was suddenly thrown or trajected into the opposing lane of travel by any hole, rut or fracture line in the road north of the point of impact. Not even the testimony of plaintiffs' expert witness sustained this theory, as Killingsworth admitted the condition of the roadway traveled by Flint was not sufficient to divert her vehicle and force it across the center line. He candidly responded that no condition of the roadway, in and of itself, could have forced, diverted or trajected Flint's vehicle across the center line. See note 14. His theories relied on the premise that Flint overreacted to roadway conditions. Even a cursory analysis of this expert's testimony leads to the inevitable conclusion that it was Flint's actions, purposeful or passive, which were the sole cause of the accident, and not the condition of the roadway.
Simply stated, plaintiffs' evidence is legally insufficient to prove the DOTD breached its duty to keep the roadway reasonably safe for non-negligent motorists. No evidence established that either of the two holes, the one 100 feet north or the one 10 feet north of the point of impact, or any of the other roadway blemishes north of the point of impact, caused the southbound lane to be unreasonably dangerous. No evidence established that these roadway blemishes caused Flint's vehicle to cross the center line.
The DOTD showed it had inspected the road's surface in the 2 weeks preceding the accident, determining the road's surface did not have dangerous defects and did not require routine maintenance.[20] Plaintiffs produced no evidence to the contrary, no evidence on roadway standards or the DOTD's violations of roadway standards; no evidence of complaints by citizens or law enforcement personnel regarding the condition of the highway's surface; and no evidence of other accidents occurring in the southbound lane despite it being daily traveled by 1,150 to 1,600 vehicles.
Negligence is only actionable where it is both a cause in fact and a legal cause of the injury. Sinitiere v. Lavergne, supra. Thus, not only is the DOTD not liable to plaintiffs because it did not breach its duty to maintain LA 107 in a reasonably safe condition, it is not liable because plaintiffs failed to prove a substandard condition of the roadway was a cause in fact of the accident. The cumulative evidence, as a matter of law, does not support a finding that a defective condition of the roadway caused Flint to cross the center line.
The lack of evidence showing yaw or skid marks, evasive action by either vehicle, is consistent with Flint inattentively driving in a straight line instead of following the curvature of the road, and with Ryland not *1303 perceiving Flint's course because her vehicle was in the curve. Alternatively, if Flint chose to skirt the blemishes in the expansion portion of the road, the lane was sufficiently wide for Flint's Chevette to drive left of the blemishes and remain in the southbound lane. The DOTD had no duty to protect Ryland from the risk that Flint, in an intentional attempt to dodge a prospective worn spot, would cross the center line and drive one third into the opposing lane of travel despite it being occupied by an approaching vehicle. The legal duty imposed on the DOTD to maintain reasonably safe highways is not designed to protect against such a risk. Rules of conduct are designed to protect some persons under some circumstances against some risks. LeBlanc v. State, 419 So.2d 853, 855 (La.1982). If Flint crossed the center line with the intention of evading the blemishes on the right side of her lane, she breached the duty of reasonable care she owed to herself and to Ryland to be a reasonably prudent driver and to keep her vehicle under control.
Therefore, we conclude the evidence advanced at trial did not substantiate that the segment of the southbound lane preceding the point of impact was defective or unreasonably dangerous, or a cause in fact of the accident. The DOTD did not breach the duty it owed to both the south and northbound vehicles to maintain in a reasonably safe condition the portion of the roadway traveled by the southbound vehicle.

DECREE
For the reasons stated, the automobile accident did not result from a roadway defect which created an unreasonable risk of harm and the State of Louisiana, through the Department of Transportation and Development did not breach the duty it owed to keep the roadway in a reasonably safe condition. Accordingly, the trial court and court of appeal judgments are reversed insofar as they apportioned the State of Louisiana, through the Department of Transportation and Development 75% at fault. Judgment is rendered in favor of the State of Louisiana, through the Department of Transportation and Development, dismissing it from the suit. The judgments of the lower courts are amended to find Debbie K. Flint solely at fault.
REVERSED IN PART; AMENDED IN PART.
Pursuant to Rule IV, Part 2 Section 3, DENNIS, J., was not on the panel which heard and decided this case.
WATSON, J., dissents.
NOTES
[1] Pursuant to Rule IV, Part 2 § 3, Dennis, J., is not on the panel which heard and decided this case.
[2] The vehicle which struck Karen Ryland's vehicle was driven by Debbie K. Flint and was owned either by Henry W. Lucas, II, or by Flint's fiancee, Henry W. Lucas, III. The Rylands' petition alleged the vehicle was insured by Liberty Lloyds, and that Flint's fiancee lived with either his mother, Rita Folse, or his father, Henry W. Lucas, II. The claims against these persons were settled by payment of the Liberty Lloyds' policy limits of $10,000.
[3] The court stated that Mr. Lawrence Adams, Avoyelles Parish Maintenance Superintendent for the DOTD, "testified that the system of detection consists of his riding the roadways of the Parish on a periodic basis. No explanation was offered as to where he would go first, what would happen if he could not go, or any method of alternate inspection."
[4] After finding the State had actual or constructive knowledge of the roadway's defective nature, the court focussed on the State's method of allocating its repair and found its system of inspection "ludicrous." The trial court continued.

Although it was testified to that the roadway at the accident site had been overlayed, there were no records to show that repairs had ever been ordered for this site or that repairs had ever been effectuated. The explanation for this was given by Mr. Vidrine, a State road supervisor, who stated "we don't pass up one hole to patch another." What this translates to is that, although work has been ordered for a defect in one location, if the driver or other worker on the highway truck felt another hole was worse, then that hole was repaired. Such a method of allocating repairs to roadways can, in no manner, be deemed to be reasonable and prudent. There were no standards in place, at least in Avoyelles Parish, for prioritization of repairs to highways that posed varying levels of dangers to drivers. To leave repairs to the unbridled discretion of laborers, often unskilled in anything but manual labor, borders on gross negligence and cries out for a remedy.
[5] The appellate court found the allocation of fault was not manifestly erroneous for reasons which included:

The evidence shows the portion of Highway 107 at the accident site, possessed many holes, crevasses, and cracks going both horizontally and vertically which would cause a small car, such as that driven by Flint, to lose stability when negotiating the curve ... (emphasis added.) 617 So.2d at 589.
[6] "POI" refers to point of impact. "Veh # 2" refers to Flint's vehicle and the path it took after impact.
[7] On Trooper Riche's cross examination by DOTD's counsel, the following colloquy occurred:

Q. Other than the small pothole which you circled [in R-6], do you observe any other conditions of the roadway from the point at which you and Trooper Anderson were standing to the point at which your patrol cars are parked that are of particular notice?
A. The only thing I see is some cracking and some patchwork right around the area of the small pothole.
Q. And this small pothole was ... when you were back out there Monday you described it I believe as being relatively shallow depth and not real large in diameter.
A. That's correct; that's right.
Q. Do you know whether or not it's larger today [September 14, 1991] than in August of 1988?
A. I have no idea, sir.
Q. The unevenness that you described, Officer Riche, is simply the difference in elevations that you observed along the crack lines in the roadway?
A. Yes, sir.
Q. And this makes the roadway to a motorist feel a little rough driving across them?
A. It possibly could.
Q. But that's the extent of the difficulty a motorist would encounter in your observation?
A. Yes, sir, that would be the largest part of it, yes, sir.
Q. It wouldn't, in your estimation, divert the direction in which a vehicle was traveling.
A. I've never had a problem with it diverting my travel.
Q. And you would not consider this condition hazardous to most motorists, would you?
A. No, sir, I wouldn't.
Q. Would you consider an operator who has traveled this stretch of roadway 10 to 15 times to have had an opportunity to become adequately familiar with the conditions of the roadway?
A. That I don't know, sir. I guess it would depend on the individual.
Q. Okay. In your experience, would it take you more than one time personally to go across this roadway and make note of the conditions that existed?
A. It would take me two or three times.
* * * * * *
Q. Is there anything that you see in this photograph [R-6] or that you remember from your investigation of the accident that would have prevented Ms. Flint from being able to steer her vehicle between the cracking which parallels the center line, I mean, excuse me, parallels the edge line, the white edge line, and the yellow center line without crossing the center line of that highway?
A. No, sir.
Q. Was there anything which you observed either the evening of the accident, the next morning or since you've been back to the scene of the accident which would have impaired the southbound motorist's visibility of the Ryland vehicle in the northbound lane?
A. No, sir.
Q. Should that visibility in fact have been enhanced by the fact that it was a dark evening and both vehicles had their headlights on?
A. Yes, sir.
[8] However, on recross examination by defense counsel, Trooper Riche admitted he did not regard the roadway traveled by Flint to be hazardous:

Q. Nevertheless, Officer Riche, whether considering at the time you were investigating the accident or considering it upon your re-review of the accident scene just recently, you would not consider the condition of this roadway near where this accident happened to be hazardous.
A. No, sir.
Q. All right, okay. And in the alternative to the court's questioning you concerning a sudden swerving into the northbound lane from the southbound lane, is it not as likely in your experience that perhaps considering the nature of the curve, the gradual entry into a curve, that Mrs. [sic] Flint simply did not realize that she was in the curve and drove straight across the center line, impacting with Mrs. Ryland?
A. There's several possibilities, sir. I guess that could be added to the list of them.
Q. Would you say it would not be just as likely as her sudden swerving into the left lane, I mean, excuse me, into the northbound lane.
A. Yes, sir, that's ...
Q. Just as likely.
A.... yes, sir.
[9] Without having stepped-off any of the pot holes, he thought them fairly large, about 4 or 6 inches by 14 inches. He considered the potholes in R-12 to be fairly representational of the potholes in the road.
[10] While testifying as to where he believed the accident actually occurred, Detective Smith circled an area in R-12 near where Ryland's vehicle burned, located south of the point of impact. Thus, his testimony which referenced potholes in the southbound lane as being 35 to 40 steps from the point of impact or 8 to 10 feet from the point of impact, might place these potholes south of the point of impact. However, discussing R-19, he briefly referred to a pothole pictured across from his vehicle and near another pothole. He could possibly have been describing the potholes pictured in R-12, which were located approximately 100 feet north of the point of impact.
[11] Vidrine's crew asphalts with hot mix about 5 months a year and patches potholes with cold mix during the remainder of the year. In the wintertime, two other crews also patch potholes with cold mix. Potholes are not patched with hot mix, only with cold mix.

Vidrine testified that his supervisor directs him to the road tracts which need repair. However, if enroute to an assigned repair spot, he encounters a hole in need of repair, he repairs it. Consequently, not all asphalt repairs are logged in the DOTD's records.
Vidrine testified he was aware of the approximate area of the accident site but he had never viewed it from that perspective. Since he did not know exactly where the accident occurred he could not state whether his crew had done asphalt work on that particular spot, especially as work records did not reflect that asphalt work had been done in the curve.
[12] Stephen Killingsworth, a registered mechanical engineer with a B.S. in mechanical engineering and an M.S. in engineering systems with specialties in structural and mechanical engineering, was accepted by the trial court as an expert in the field of mechanical engineering and as an expert in accident reconstruction "in the field of the dynamics of objects in motion and what makes them act and react, given the stimulus and response." Killingsworth admitted he had no specific training in highway design, highway maintenance or traffic engineering.
[13] On cross examination he confirmed he was suggesting that, upon Flint's observation of a second patch of voids 100 feet farther south, very near the point of impact, she steered 30 to 45 degrees to the left across the center line and struck the Ryland vehicle. He believed his suggestion that Flint's vehicle approached Ryland at 30 to 45 degrees was consistent with the police report that both the vehicles struck left front (points L, K, and J for one vehicle and K and J for the other vehicle).
[14] On Mr. Killingsworth's cross examination by defense counsel, the following was stated:

Q. In your viewing of this accident scene, you saw nothing ... no condition in the road surface in this location that would have directly caused Mrs. [sic] Flint's vehicle to cross the center line in the fashion in which it did. That's all ... your whole theory bears upon in the reactions [sic] of one of these voids or an attempt to avoid a patch after she has already driven across a rough portion of highway, correct?
A. It's triggered by it, that's correct. In other words, the roadway is triggering or contributing to her crossing the center line. It's the center line that of course is the accident, but it's what [sic] triggering it is the road surface.
Q. But none of these conditions, in and of themselves, could have forced her vehicle to cross that center line without a poor reaction on her part.
BY THE COURT:
What he's asking is, could that vehicle based on these road defects have become airborne and crossed it?
Q. Or just diverted. Not necessarily airborne. Steer the tires at 30 degrees and force her to go across the road?
A. In and of itself, no.
Q. So your entire theory is based upon her reactions to encountering these rough conditions as she drove along the southbound lane of Highway 107.
A. Well, you're saying encountering ... in answer to your question, yes, but encountering, I would not use that word. I would say that she eitherif you want to use the word encountershe encountered and then reacted before she got to the next patch. Or, on the other one, the first scenario, that she impacted the void and is trying to compensate for that force that's imparted to the vehicle.
Q. And turns the vehicle 30 or 45 degrees.
A. That's correct.
[15] The record also contains the recorded statement of Trooper Anderson taken by Littleton-Brown Claim Service on December 19, 1989, wherein Trooper Anderson stated "It [the accident] was the fault of the driver of the South bound vehicle that crossed the center line for an unknown reason." in response to the query, "did you notice any condition of the roadway that could have contributed to the accident, was there pot holes?," the trooper responded, "No, the road was in good condition, there was no pot holes, no bumps, no faults in the roadway, that I could find whatsoever." About the speed limit, he stated, "No, no it's not posted too high, if you drive the speed limit there your [sic] safe and be able [sic] to control your vehicle with no problem." When asked whether he had any comments he would like to add, Trooper Anderson stated: "The only thing I can say is that I can't see where it would have been the fault of the roadway in any way, it was just carelessness of the driver of the Chevette that crossed the center line and there was nothing there to make her cross it."
[16] During the cross examination of Trooper Anderson, the following exchange occurred:

BY THE COURT:
How about looking back to August of '88? Would you, knowing what you know now, not necessarily the road condition now, but having seen these things you may not have looked at that night, would you note [on your report] road defect?
A. No, sir.
[17] Mounce testified his Bachelor's, Masters and Doctorate degrees are in civil engineering. The specialty of his undergraduate degree was highway construction while the emphasis of his Master's degree was traffic engineering and safety. His Ph.D. focused on the human factors related to transportation.
[18] LSA-R.S. 9:2800 provides in pertinent part as follows:

§ 2800. Limitation of liability for public bodies
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.
* * * * * *
[19] The trial court stated that, "A viewing of the photographs, as well as the testimony of the witnesses, convinces this Court that the road surface was so severe as to either throw the Flynt [sic] vehicle into the Ryland lane or so severe that, when confronted with imminent impact, Ms. Flynt [sic] attempted to avoid the road hazard and went into the Ryland lane. The cracks in the roadway at the center line were of such severity that, even if Ms. Flynt [sic] would have tried to drive around the hazard, when her tires reached the center line, her vehicle would have been pulled, somewhat, into the Ryland lane ..." There was no evidence that Flint's vehicle could be pulled into the northbound lane by traversing the cracks in the southbound lane near the center line.
[20] Compare the evidence herein to the facts of Sinitiere v. Lavergne, supra, where the DOTD breached its duty to maintain the roadway in a reasonably safe condition when the DOTD inspected the highway a few days prior to the accident; determined the 3½ to 4 inch drop off between the road and its shoulder, which was the cause of the accident, was dangerous and in violation of the DOTD's guidelines; and admitted it could have interrupted its scheduled work to correct the defect, but it had determined the situation did not necessitate immediate attention. 391 So.2d at 825.