| .WALTZER, Judge.
This is an appeal from a judgment of the district court solely on the issue of liability, finding in favor of the plaintiffs Wallace Cou *1137 ture, Roland Rossignol, Alfred Seheeler, and Mr. and Mrs. Michael Shephard, and in favor of intervenors, Louisiana Insurance Guaranty Association and St. Bernard Parish Police Jury, and against the defendants, St. Bernard Parish Police Jury and The State of Louisiana through the Department of Transportation and Development, apportioning the liability of those defendants as: State DOTD 66¾%; St. Bernard Parish Police Jury 33⅜%. From that judgment, defendants appeal.
The trial court rendered exceptionally thoughtful and thorough written reasons for judgment as follows:
This case was tried before Honorable Thomas M. McBride, III, District Judge, now deceased, on the issue of liability alone. The parties have stipulated that after review of the transcript, exhibits and post-trial memoranda of the parties this case shall be decided upon the record made before my predecessor rather than to go through the expense of an additional trial. Having now completed that task, this Court has ruled in the manner and for the reasons hereinafter set forth.
The live testimony[1] presented at the trial may be subdivided into two broad classifications: the parties and their respective expert witnesses. Earlier depositions and statements of witnesses who ^observed the movement of the vehicles prior to the collision were admitted in lieu of the witnesses’ testimony at trial. Without attempting to cover every detail of each witness’ testimony, this Court has perceived the following to be each witness’ perception of the facts of this case. Where their testimony is not contradicted by the testimony of other witnesses or the other evidence in this case, this Court will accept their testimony as true. Where their testimony is contradicted, however, this Court will attempt to ascertain the truth and the credibility assessments respecting the particular testimony will be that which is implicit in the determination of fact made by this Court.
Mr. Wallace Couture was employed by the St. Bernard Parish Police Jury on July 6, 1987, as the driver of a trash truck which was owned by the defendant, St. Bernard Parish Police Jury. It had been raining extremely hard for the few minutes before he arrived at the location of Maintenance Area Yard No. 5, as it had been intermittently doing throughout the day until then. Area 5 Yard is situated at the end of a curve of Louisiana Highway 39, also known as East Judge Perez Drive, near the E.J. Gore Pumping Station. Both the pumping station and the Area 5 Yard are situated upon land within the State Department of Transportation and Development’s right-of-way along East Judge Perez Drive.[2] That yard was constructed *1138 by the St. Bernard Parish Police Jury using its own employees without the benefit of a contractor. The parish thus clearly had notice of the placement of its Yard, and it was not necessary that it also know that its placement there infringed upon the clear zone.[3]
|3Mr. Couture had been generally instructed by his employer, defendant St. Bernard Parish Police Jury, to go to the Area 5 Yard and pick up employees who were being employed by the parish under the federally funded JTPA[4] who were assigned to assist him (Mr. Couture) in picking up trash. On the occasion in question, he was to pick up two men, only one of whom was a JTPA employee. Those men were Roland Rossignol, a fulltime parish employee who is a plaintiff in these consolidated suits,[5] and Henry Rogers, the JTPA worker with whom the record shows a settlement was made. Mr. Couture was to have picked up those two men at the Area 5 Yard after lunch. After completing his own lunch, Mr. Couture went to the Area 5 Yard, arriving there about 1:15 P.M., to pick up Rossignol and Rogers. Mr. Couture testified that he usually drives into the Area 5 Yard to pick up or discharge employees, but on this occasion, because of the severe weather conditions, the driveway entering the Area 5 Yard was blocked by an accumulation of parish vehicles that had been parked there by other employees who had sought refuge from the storm in the trailer at the Area 5 Yard. The area in front of the gate, however, was not blocked, as shown by photographs taken on the date of the accident showing vehicles parked along the fence but not in front of the gate.[6]
A shell-paved area had been made by police jury employees between the shoulder of the highway and the fence surrounding the Area 5 Yard, which was also used for parking vehicles, stopping to pick up employees, and other things involving both parish and employees’ personal vehicles. On this occasion, Mr. Couture stopped on the shells with his left wheels still touching the paved shoulder of the road. He used the trash truck horn to signal his arrival to Rossignol and Rogers, who were then standing on the porch of the trailer awaiting his arrival. Mr. Couture testified that he turned on the flasher lights of the trash truck and waited for about five minutes before the rain diminished sufficiently for Rossignol and Rogers to run to the trash truck. While waiting in front of the gate on the shells, Mr. Couture was looking forward and did not see the approach from his rear of a small pickup truck which was then being operated by Alfred Scheeler, then a minor. Following impact, the trash truck rolled approximately fifty feet before stopping. Mr. Couture brought the truck to a halt by applying the brakes. There was no evidence of his speed at the time he applied the brakes.
Mr. Couture was aware of the manner in which the rain affected the roadway in the immediate vicinity of the curve where the | ¿Area 5 Yard was located. He had traversed it only moments before. Despite his inability to recall the details concerning where the water was then puddling on the highway, he could recall on the basis of *1139 prior similar circumstances that the water would stand on the highway even though it was slightly banked in the curve. (See Tr.. 24, particularly where Mr. Couture answered: “Even though it is inclined, they still have low spots in there.”) Mr. Couture further testified that his stopping where he did was not an emergency situation and that he could have driven even farther off the roadway than he did. Mr. • Couture stopped on the edge of the shoulder, rather than closer to the fence, pursuant to instructions of supervisory employees of the defendant Police Jury. The Police Jury did not call any employee to refute the testimony regarding its instructions to Mr. Couture. Based upon the above outlined evidence, this Court concludes that Mr. Couture could have driven the parish trash truck at least six more feet closer to the gate than he did while waiting for the rain to stop. He did not do so because he followed his employer’s instructions.
Alfred Seheeler, the minor who operated the pickup truck, testified that he, Matthew Shephard and Brandon Lamarque left his home in Lexington Place and drove toward his old home in Plaquemines Parish, but they turned around when the pickup truck was run off the road by a truck during the heavy rain. Seheeler decided to return home rather than to continue to Plaquemines Parish in the rain storm. He decided to take the new extension of East Judge Perez Drive back to his home. That highway runs in front of Lexington Place Subdivision, but the new extension of East Judge Perez Drive intersects St. Bernard Highway (La.46) at a point more southerly than its intersection with the Braithwaite highway from which Seheeler and the other two boys were returning via the Judge Perez Drive extension. That was Scheeler’s first occasion to drive on that segment of roadway in the rain. Seheeler was driving in the right lane of East Judge Perez Drive, proceeding in a westerly direction as he passed behind St. Bernard High School. He noticed water in the right lane of the highway at various points during his trip along that roadway, but none of that had been sufficient to cause him more than the usual concern for such driving conditions. The water accumulation had not caused him any loss of control of his vehicle. As he approached the Area 5 Maintenance Yard around a curve, he saw water in the right lane which did concern him. He estimated that water to be an inch or two deep. He contemplated changing lanes, but, before he could do so, he entered the water and the pickup truck began to spin out of control. While spinning, he saw the trash truck stopped in a position he believed to be partially in the right travel lane. Seheeler testified that he vaguely remembers the driver’s side tires being in his lane.[7] He was unable to avoid colliding with the Rtrash truck because he had already lost control of the small pickup truck he was driving. He did not see the truck until he was twenty to thirty feet away from it.[8] He did not remember see *1140 ing any lights on the truck.[9] Scheeler was rendered unconscious in the accident and does not recall much after the vehicle went into a spin heading toward the trash truck. He confirmed Mr. Couture’s testimony that it had been raining hard. According to Scheeler, it was still raining hard at the time of the accident.[10] Scheeler testified that he was traveling 50 miles per hour, which he thought was reasonable prior to being confronted with the accumulation of water in his travel lane as he exited the curve.[11]
In the course of the testimony of Alfred Scheeler, the State DOTD and the Police Jury sought to have the Court admit the juvenile’s plea regarding his reckless operation of the pickup truck at the time of the accident. The authority cited for the admissibility of that plea was Article 412(A)(3), La. Ch. C., which exempts traffic violation proceedings from the confidentiality of juvenile proceedings. Counsel for the minor, however pointed out that a plea in the nature of nolo contendere had been offered and the record of those proceedings had been ordered sealed by the Court which accepted the |6plea. A proffer was made of the plea, but it was shown that the plea had been tendered under circumstances which precluded its being used against the minor or his parents in subsequent civil proceedings. A plea of guilty to a traffic charge is an admission against interest by the driver and is relevant evidence which is admissible to prove fault of the driver during civil litigation. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). But a plea of nolo contendere has no effect beyond the particular criminal proceedings in which it is accepted, and it cannot be employed as an admission in any civil suit for the same act. Louisiana State Bar Ass’n v. Connolly, 206 La. 883, 20 So.2d 168 (1945) (sic); Williams v. Regional Transit Authority, 546 So.2d 150, 160 (La.1989); Clifton v. Collins, 563 So.2d 408, 410 n. 1 (La.App. 1 Cir.1990). Therefore, the type of plea that was offered and accepted by the Court in the traffic proceedings against Scheeler may not be treated as an admissible admission against interest in this civil action based upon the same occurrence. Judge McBride correctly excluded such testimony. Therefore, 'this Court does not give any weight to the proffered testimony concerning the plea of Alfred Scheeler with regard to the subject matter of this suit.[12]
*1141 Roland Rossignol, a fulltime parish employee assigned to assist on the trash truck involved in this case, was on the porch of the trailer parked inside the Maintenance Area 5 Yard waiting for Mr. Couture to return to pick up him and Henry Rogers. Rossignol had been waiting for between five and fifteen minutes when Mr. Couture stopped at the gate to pick them up. While waiting for Mr. Couture to return, Mr. Rossignol could see that it was raining heavily and that water was accumulating on the road. Mr. Rossignol had worked out of the Maintenance Area No. 5 Yard for as long as that yard had been situated off East Judge Perez Drive on the highway right-of-way. He was familiar with the propensities of that area to collect water on the roadway. So was Mr. Couture, who testified that the roadway collected water even in the inclined areas because of “low spots” in the roadway. Since none of the experts saw the roadway under conditions where it accumulated water, and none of the expert ^witnesses denied that there were “low spots” which would hold water[13] in the right lane, the testimony of the witnesses that the roadway did hold water is accepted by this Court as true. In fact, photographs taken during the accident investigation showed the accumulation of water on the right shoulder of the roadway quite a while after the accident. The photographs taken on the date of the accident clearly show that the shoulder of the roadway was not inclined in the same direction as the roadway itself. See Exhibits P^47, P-48, P-50. Mr. Anderson defined that as a “negative cross slope” and testified that condition would tend to pull a vehicle toward the right, off the highway.
In the summer, the JTPA workers were required to bring their own lunches to work and to eat them at the trailer in the Area 5 Yard. On occasions, Mr. Rossignol ate at the Yard, also, when someone else on the trash truck crew did. That was the circumstances which existed on the date of the accident in this case. Henry Rogers, the JTPA worker, was required to eat his lunch at the trailer unit within the Maintenance Area 5 Yard.
When Mr. Couture drove up to the gate, Mr. Rossignol and Henry Rogers stayed on the porch, waiting for a break in the rain. When the rain slackened, Mr. Ros-signol and Henry Rogers dashed toward the trash truck, about 40 or 50 feet away from the porch of the trailer unit, running through the various vehicles that had been parked in the driveway by other parish employees as they sought refuge from the storm. Mr. Rossignol and Henry Rogers ran toward the truck and Mr. Rossignol jumped on the running board and opened the door. Before he could get in the cab of the truck, the pickup truck hit the back of the trash truck. When the trash truck was struck, Mr. Rossignol was thrown from the running board to the fence — a distance the photographs and testimony regarding the location of the fence and trash truck show was substantial.
Mr. Rossignol contradicted Mr. Couture’s testimony regarding the frequency with which Mr. Couture stopped the truck at the gate rather than parking inside the fence in the driveway. He explained that the men knew about when Mr. Couture would return to pick them up and that they waited for him and would run out to the truck when he stopped. Mr. Rossignol acknowledged that there were many times, such as on the date of this accident, that Mr. Couture could not get into the yard because other equipment was parked in the driveway and blocked access by the *1142 trash truck to the compound. This Court Isbelieves, from Mr. Rossignol’s explanation, that more often than not Mr. Couture stopped in front of the gate on the shoulder of the highway to wait for the workers to run out to the truck, rather than, as he recalled during the trial, that he usually drove the parish trash truck into the compound to pick them up. The evidence shows that there were other occasions when Mr. Couture would have been unable to enter the yard because other equipment blocked his entry into the compound. But the evidence further shows, at least on this occasion, that he could have stopped more than six feet closer to the gate than he did. Mr. Couture acknowledged in his own testimony that he could have done so. Both men testified Mr. Couture had been instructed by supervisory parish employees to stop where he did to pick up the workers after lunch. Therefore, especially in the summer time when the JTPA workers were employed and were required to eat at the Yard, the trash truck was regularly stopped upon the shoulder of the road outside the gate of the Area 5 Yard to pick up those employees following the lunch break.
Mr. Rossignol also disputed Mr. Couture’s testimony concerning the position of the trash truck with respect to the highway. He thought the truck was completely off the shoulder in the shells. However, that belief was founded upon his misim-pression, probably formed on the basis of his observations before the collision from the porch some forty or fifty feet away from the right side of the truck, which side of the trash truck was completely off the asphalt shoulder. When Mr. Rossignol ran to the truck, he got on the right running board. Since it had been raining very hard, it is most likely that Mr. Rossignol was looking at the ground while he ran so he would see and avoid puddles of water that had accumulated in the Yard. Therefore, his knowledge of the position of the truck would not likely have been improved as he ran toward the truck. The photographs taken of the truck after the collision show the truck to have been in essentially the same position relative to the shoulder of the roadway as it was when Mr. Couture stopped it — although some fifty feet beyond the point he had initially stopped because the impact from the pickup truck caused the trash truck to roll that far. The brunt of the force of impact of the collision was primarily from the rear of the parish truck.[14] That would have caused the trash truck to roll straight forward. Therefore, the relative position of the parish truck when brought to rest after the accident is approximately the same, so far as the relationship to the lanes of the roadway is concerned, as it was prior to the collision. The Court believes Mr. Couture’s estimation of the location of the | struck to have been more accurate, both because he was the one who positioned it there and because Mr. Rossignol’s viewpoint was inadequate to permit him to accurately establish the position of the truck’s wheels on the far side of the truck. Accordingly, Alfred Scheeler’s estimation of the location of the truck, which he only saw moments before he collided with it, is not reliable and is also rejected by this Court.
Mr. Rossignol also testified that the area between the paved shoulder of the road and the fence had been paved with shells to accommodate the parking of the employees’ personal vehicles outside the yard. Photographs taken after the accident show a few personal vehicles parked along the fence. See, e.g., Exhibits P-22, P-50 (vehicles along fence to right of two wrecked vehicles), P-52. Those photographs also confirm Mr. Couture’s testimony that he could have pulled further off the shoulder in front of the gate. See Ex. P-48, P-50, *1143 P-52. Estimates based on the comparison of the sizes of the vehicles in the photographs confirm the Court’s view that the parish truck could have been driven at least six feet closer to the gate, parallel to the fence, than it was actually driven by Mr. Couture. His failure to do so was a result of his being instructed by his supervisors to wait on the shoulder for the men to come to the truck.
The expert witnesses of the plaintiffs and defendants disagreed on many points, most of which are not dispositive of the facts in this case. There are several areas of agreement which will be first addressed. All the experts agreed that this accident was not caused by the speed of the Scheeler vehicle. They all agree that the damage on the Seheeler vehicle establishes that the Seheeler truck was rotating clockwise as it spun out of control and struck the trash truck. And they all agree that the clockwise rotation of the pickup truck was caused by one of two possible occurrences: either (1) a steering input to the right[15]; or (2) resistance to the right side of the pickup truck, ie., “differential drag,” as the left wheels continued to operate without that type of resistance being applied to the left side of the pickup truck.
Mr. Seheeler testified that he lost control of the vehicle when it began to spin after the pickup truck struck a puddle of water on the roadway. The water was on the right side of his truck. Brandon Lam-arque, the only living passenger[16] in the pickup truck, testified in his deposition (Lamarque deposition, pp. 9-10):
We were turning, and we hit the puddle, and we started spinning, and we hit the truck.
11()Asked the size of that puddle, Lamarque testified (id,., p. 47): I don’t know. It had to be pretty big to make the truck spin.
Lamarque testified that “Half the road was covered with water.” (Id., p. 47) When the car struck the puddle which caused the car to spin, Lamarque heard the water splash on the right side of the pickup truck. The statement of Mr. Major, taken by the Police Jury a few weeks after the accident, related that there was water standing on the highway. (Major statement, p. 2) Parnell King, another passenger in the same vehicle as Major, also said there was water standing on the pavement.[17] From all of that testimony, this Court concludes that there was standing water on the right side of the highway, in Scheeler’s lane of travel, which caused his pickup truck to spin out of control when he drove into it.
The witnesses used the term “hydroplaning” to describe the loss of control resulting from striking the puddle of water. The expert testimony clearly shows that did not occur. Dr. Blaschke analogized the effect of the right tires hydroplaning while the left wheels retained their traction to an ice skater lifting his right foot while continuing to skate on his left foot. When an object hydroplanes, there is no significant degree of friction which would produce drag. Therefore, hydroplaning on one side would not cause rotation of the vehicle.
Dr. Griffith and Dr. Blaschke both testified that striking a puddle of water which was deep enough to produce significant resistance on the right side of the vehicle would produce clockwise spin, as occurred here. They differed with regard to the depth of water necessary to produce that result, but even Dr. Blaschke acknowl *1144 edged in his deposition, used to cross-examine him upon his trial testimony that it would require a depth of 1⅜-2" of water to cause such a spin, that ½" of water could be sufficient to cause that result under some circumstances.[18] Because of the timing of the spin simultaneously with the entry of the puddle of water by the right tires of the Scheeler pickup truck and the scientific explanation concerning how that could cause the precise occurrence of clockwise spinning of the Scheeler vehicle, it is the conclusion of this Court that Scheeler lost control of the vehicle not as a result of his own negligence but as the result of a defective condition of the highway which held water of sufficient depth to cause differential drag upon the right tires of vehicles operating on the highway. Once he lost control due to that | ndefect, he was unable to regain control and any failed efforts to do so cannot be regarded as fault on Scheeler’s part.
Mr. Roy Anderson, with whose credentials and reasoning this Court is impressed, testified that a properly designed and constructed highway should have drained a heavy rain so that it would not have held water of sufficient depth to be a hazard to motorists using the roadway. He also found there to be rutting in the roadway which could have contributed to the roadway holding water. He found the materials of which the wearing course of the roadway was constructed to have been inferior and conducive to rapid wearing, which would have occurred in the tracks of vehicles using the lanes of the highway. The two parish employees, Couture and Rossignol, both had observed the tendency of the roadway to hold water prior to this accident. All of that testimony clearly indicates that the roadway held water at the end of the curb where Scheeler lost control of his pickup truck and that the water was present due to deficient drainage or faulty maintenance[19] of the highway.
The plaintiffs’ experts viewed the accident in this case as two separate, consecutive events: (1) the loss of control due to the differential drag on the right wheels of the Scheeler vehicle caused by standing water on the highway, and (2) the collision with the parish trash truck. Having reviewed all the expert testimony and made credibility assessments regarding the expert witnesses and their conclusions, this Court agrees that each of the incidents above described should be treated as separate incidents having distinct causation and different probable consequences.
The testimony of the experts shows that the collision with the trash truck probably would not have occurred if the trash truck had been parked six or more feet farther from the highway. The construction of the Area 5 Yard and the shell-improved parking spaces along the fence, coupled with the Police Jury’s supervisory employee’s instructions to park where he did, caused Couture to park in the space which should have been available for the recovery of control over the pickup truck. If Mr. Couture had pulled closer to the gate on the shell-paved area in front of the fence to stop and wait for Rogers and Rossignol, the collision with the trash truck would probably have been avoided as Scheeler’s pickup truck spun out of control past it. Therefore, the improper placement of the trash truck is a substantial cause in fact of this accident. The accident also would not have occurred without the loss of control of the pickup truck. Thus, those instructions must be analyzed separately from a duty/ risk viewpoint. Moreover, to the extent that liability of the public bodies is based upon Article 2317 et seq., La.C.C., the evidence must be analyzed to determine whether those bodies had actual or con *1145 structive ] ^notice and a reasonable opportunity to remedy any defect which was a cause in fact of the accident in this case. La.R.S. 9:2800. See, also, Ryland v. Liberty Lloyds Ins. Co., 630 So.2d 1289 (La.1994); Purolator Courier Corp. v. City of New Orleans, 635 So.2d 1232 (La.App. 4 Cir.1994).
The presence of water on the roadway was a transitory condition, but it resulted from a defect in that the roadway did not drain properly. The DOTD performed periodic inspections of the roadway, but it never found that condition or the underlying defect to exist. There is no evidence that any inspection occurred during a heavy rain, even after this accident occurred. Fair weather inspections are not adequate to discover defective conditions caused by the accumulation of rain water upon the roadway. A public body may not hide behind the notice requirement to escape liability by failing to perform inspections under circumstances that would inform it of dangerous conditions. Fox v. Housing Authority of New Orleans, 605 So.2d 643 (La.App. 4 Cir.), writ den., 607 So.2d 570 (La.1992). The DOTD has a duty to conduct such inspections of its roadways. McCullin v. (sic) Dept. of Highways, 216 So.2d 832, 834 (La.App. 2 Cir.1968), writ den., 253 La. 645, 219 So.2d 177 (1969). Under conditions similar to those encountered by Alfred Scheeler when he lost control of his vehicle, a reasonable inspection would have revealed the hazardous condition which caused this accident. That defective condition had existed for a substantial period, as indicated by Couture’s and Rossignol’s testimony of their prior observances of the tendency of the roadway to hold water established. Therefore, the DOTD had constructive notice of the accident-causing defect. Cf. Coley v. State DOTD, 621 So.2d 41 (La.App. 2 Cir.1993) (duty to inspect coupled with drainage of rainwater on highway constitutes at least constructive notice of defect causing drainage upon the highway). The photographs of the highway clearly demonstrate the rutting in some views. The DOTD has a duty to keep the State-owned roadways in a reasonably safe condition. Ryland v. Liberty Lloyds Ins. Co., supra, 630 So.2d at 1300; Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1171-72 (La.1986); LeBlanc v. State, 419 So.2d 853 (La.1982); Sinitierre (sic) v. Lavergne, 391 So.2d 821 (La.1980); State Farm Mut. Auto. Ins. Co. v. Slaydon, 376 So.2d 97 (La.1979). The DOTD is held liable when it breaches this duty, where the roadway at the scene of the accident was in an unreasonably dangerous condition. Ryland, supra; Hunter v. DOTD, 620 So.2d 1149 (La.1993); Manasco v. Poplus, 430 (sic) So.2d 548 (La.1988); Myers v. State Farm Mut. Auto. Ins. Co., supra. The roadway, in the defect-caused transitory condition that existed at the time of this accident, was not reasonably safe for motorists, especially youthful, inexperienced drivers such as Alfred Scheeler. Of course, the roadways must be designed, constructed and maintained in a manner such that foreseeable negligent or inexperienced drivers will be able to maintain control or regain control of their vehicles if they inadvertently leave the traveled | i3portion of the roadway. The accumulation of water on the highway caused the loss of control of the Scheeler vehicle. That constitutes the first of the series of two accidents in this case. If the clear zone had been maintained, i.e., had the Police Jury not encroached upon it and had the DOTD enforced the requirements that it be provided without hazards placed within it, the trash truck would not have been regularly stopping in the clear zone where it presented the hazard realized in this case. The experts testified that there probably would have been no collision with the trash truck if it had been located only six or more feet farther from the edge of the highway than it was at the time of this accident. Thus, the elements of custody, defect, notice and causation have each been established against the DOTD, thus making the State liable to the injured parties. Unlike in Ryland, supra, a causal relation between the defective drainage of the highway and the driver’s loss of control was established by the testimony of the vehicle occupants and the expert testimony *1146 in this case. That distinction warrants a different result in this case.
Once the driver lost control of the vehicle, there was nothing he could do to avoid colliding with the trash truck. The vehicle slid in a straight line toward the trash truck which was stopped on the edge of the roadway, partially on the paved shoulder and partly on the shell-improved area beyond the shoulder. The collision occurred in less than two seconds after the driver lost control of the small pickup truck. The DOTD’s duty to maintain its highways in reasonably safe condition is designed to protect persons in vehicles whose driver loses control, as well as the driver of such a vehicle, due to a highway defect. Ryland, supra; Sinitierre (sic) v. Lavergne, supra.
The placement of the trash truck on the shoulder of the road was the result of the location of the Area 5 Yard. Had the Area 5 Yard not been constructed in the clear zone, the truck would not have been stopped there by Mr. Couture, especially in the rain, if the yard had been constructed upon the area not reserved to the State in the right-of-way — viz., 90' away from the shoulder of the roadway.
The clear zone of the highway, at the point beyond the curve where the trash truck routinely stopped to pick up employees, was occupied by Area 5 Yard and the parking lot beside the fence. The parking area was so close to the roadway that it would have been within the clear zone upon a straight section of highway without regard to the expansion of the clear zone up to 350' beyond the end of a curve.
The purpose of a clear zone is to provide a safe place within which drivers of vehicles may regain control of their vehicles and avoid injuries to themselves and others. Since the parish occupied the area which was part of the clear zone with permanent features which caused the trash truck to occupy the clear zone, viz., the fence and parking area, the question thus becomes whether the parish had a duty to refrain from occupying the clear zone and whether the harm encountered by the persons injured in this accident was within the scope of that duty. Nicks v. Teche Electric Co-Op., Inc., 640 So.2d 723, 726 (La.App. 3 Cir.1994).
|i4If the Area 5 Yard had not been located in the clear zone, the trash truck would not have been stopped there. Its presence in the recovery zone caused or contributed to the collision and deprived the driver of an opportunity to regain control of his vehicle. Therefore, the encroachment upon the clear zone was a contributing causative factor in this accident. In Nicks, supra, 640 So.2d at 726, the Third Circuit wrote:
The court’s imposition of a duty upon Teche to keep its equipment outside the “clear recovery area” was also not error. Persons and private entities using the area alongside the highway have a duty to not create obstructions or perilous conditions for motorists who inadvertently or by reason of necessity stray from the traveled portion of the highway. The court’s use of the “clear recovery area” concept in defining the duty owed reflects that concept’s use in AASHTO guidelines adopted by the state and federal governments. Considering the particular circumstances of this case, the imposition of such a duty upon a utility company is not unreasonably burdensome. Finally, we agree with the learned trial judge that the risk of harm encountered by plaintiffs was within the scope of the duty breached by Teche.
Since the DOTD required the Parish of St. Bernard to refrain from exercising any rights upon the land situated within 90' from the edge of the shoulder of the highway, it was not burdensome upon the Police Jury to require that the clear zone be maintained and it was illegal for the parish to occupy the land reserved exclusively to the State’s use. The parish has no greater right to occupy the clear zone along a State highway than does a private person or entity. Thus, the St. Bernard Parish Police Jury breached its obligation to the injured parties when it encroached upon the clear zone by building its maintenance yard there, causing the stopping or parking of vehicles within the clear zone at the *1147 end of a curve where vehicles are more prone to go out of control.
The DOTD, however, allowed the maintenance yard to remain in the clear zone. It knew the parish yard was there by virtue of its numerous inspections along that segment of highway. The parish was denied the right to build anything upon the highway right-of-way less than 90' from the edge of the highway. The maintenance yard was clearly closer to the highway than that. Moreover, it was within the clear zone, even situated 31' from the edge of the roadway, considering that the yard was located at the end of a curve in the roadway and the manner of computing the clear zone, expressed by Mr. Anderson in his testimony, clearly shows that the entire front of the parish yard was in the clear zone, not counting the parking area in front of the yard which was less than the required 30' for a straight segment of roadway. Thus, the DOTD is at fault for knowingly fallowing the encroachment upon the clear zone and it must be held liable for that fault.
Mr. Couture was instructed by his employer, the Police Jury, to pick up employees where he did. As a driver of the trash truck, it would have been reasonable for him to assume that he reasonably positioned the trash truck when he stopped it. A driver is entitled to occasionally stop along the roadside in emergency or other situations. The AASHTO Manual .and State law permits such a use of the shoulders on an occasional basis. Therefore, Mr. Couture was not at fault in obeying his supervisor’s instructions. Had the yard been located 90' back from the edge of the highway, he would surely have driven that far to pick up his co-employees, rather than requiring them to traverse that distance following a heavy rain storm. Thus, it was the placement of the yard, not the positioning of the vehicle on this occasion, which constituted actionable fault. The Police Jury is liable for instructing Mr. Couture to stop on a regular basis within the clear zone and for having located its yard within the clear zone.
Based upon the above assessment of fault, this Court apportions the comparative fault of the liable defendants -vs follows:
State DOTD 66¾%
St. Bernard Parish Police Jury 33⅜%
A judgment will be entered in accordance with the foregoing opinion reflecting the above findings of liability and apportionment of fault.

Assignments of Error on Appeal:

On appeal the State DOTD raised the following assignments of error:
1. The trial court erred in failing to find plaintiff Scheeler solely at fault in causing the accident.
2. The trial court erred in finding the highway defective and the DOTD at fault in causing the accident.
3. Alternatively, the trial court erred in its allocation of fault of the parties responsible for the accident.
On appeal the St. Bernard Parish Police Jury raised the following assignments of error:
1. The trial court erred in failing to find plaintiff Scheeler solely or partially at fault in causing the accident.
2. The trial court erred in finding the St. Bernard Parish Police Jury liable for building its maintenance yard on the state highway right-of-way clear zone, allowing the dump truck to park in the state highway right-of-way clear zone because the location of the yard was not causally related to the accident.
| k;3. Alternatively, the trial court erred in the allocation of fault between the various parties.
4. The judgment renders the St. Bernard Parish Police Jury partially liable for the claims of Couture and Rossignol despite those parties’ not filing suit against the St. Bernard Parish Police Jury.

Both Defendants Assignment One:

Both appellants argue that the trial court erred in failing to find plaintiff Scheeler par *1148 tially or totally at fault in causing the accident.
First, DOTD argues that the police report prepared by State Police Trooper Reuben Berry, admitted as Joint Exhibit 61, should be controlling on the issue of causation.
Initially we note that determinations of causation are the province and privilege of courts. If police officers on the street were able to make final and binding determinations of causation, there would be no need for courts, but such a practice would violate the constitutional mandate of separation of powers.
Turning to Trooper Berry’s report, therein he stated:
CONCLUSION:
Accident occurred as a result of poor ' weather conditions and driver of vehicle No. 2 exceeding a safe speed in curve in road due to his driving inexperience. Driver of vehicle No. 2 apparently inattentive or distracted lost control of vehicle No. 2 in curve. An examination of the road by TFC Berry could find no noticeable defects.
We note that State Trooper Berry did not witness the accident, thus his report is hearsay. The statement “Driver of vehicle No. 2 apparently inattentive or distracted” is pure speculation. By the time that Trooper Berry reached the accident scene, all of the injured people had already been removed by ambulance to area hospitals. Additionally, plaintiff Scheeler had been rendered unconscious by the accident, thus his state of mind or state of attention or inattention immediately prior to the accident had not been communicated by him to anyone. | ^Of the other two passengers of the Scheeler vehicle, one was dead and one was unconscious for 15 minutes, whereupon he revived and was taken to the hospital. He stated in his deposition that he did not talk to any policemen and that immediately prior to the accident, no one was talking, much less “cutting up” and there was no radio in the truck. Thus the only person from within the Scheeler vehicle that could have communicated to Trooper Berry Seheeler’s state of attention or state of mind would have said that Scheeler was not inattentive or distracted immediately prior to the accident. Officer Berry did not talk to him.
We do not know what Trooper Berry meant by “no noticeable defects”. While policemen with many years of experience in traffic accidents do begin to develop a specialized knowledge, traffic policemen are still not engineers or highway construction experts. We do not know if or how much prior traffic experience Trooper Berry had, nor do we know if Trooper Berry would have been able to detect the highway design defect known as “negative cross-slope”, thus “no noticeable defects” may only mean that Trooper Berry did not know that negative cross-slope, i.e. the slope of the highway different from the slope of the shoulder, is a defect, hence he did not notice it.
Second, DOTD recounts the testimony of various witnesses and argues that the cause of the accident was oversteering by Arthur Scheeler and not the negative cross-slope which created the puddle and differential drag occurring when the wheels of the vehicle hit the puddle. One of the arguments that DOTD makes is why didn’t the vehicles behind the Scheeler vehicle also have accidents. Not all of the vehicles were in the lane that Scheeler had been in and all vehicles slowed to a stop because of the accident. There were bodies on the highway immediately after the accident. On appeal, we are limited on questions of fact and credibility [ igby the manifest error doctrine. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) on remand 370 So.2d 1262 (La.App. 3 Cir.1979) writ denied 374 So.2d 660 (La.1979); Rosell v. ESCO, 549 So.2d 840 (La.1989) on remand 558 So.2d 1360 (La.App. 4 Cir.1990) writ denied 561 So.2d 105 (La.1990); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert denied — U.S. -, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In the instant case, however, the judge who had the opportunity to observe the demeanor of the witnesses, the reasoning of the manifest error doctrine, died before issuing judgment. By stipulation of all parties, the second judge examined only the *1149 ■written transcript, as an appellate court does, and issued judgment on that basis.
Defendants argue that because the rendering judge did not observe the witnesses, the manifest error standard does not apply to his findings of fact and assessments of credibility.
We have several responses to this argument. First, the caselaw holds contrary. In Virgil v. American Guarantee & Liab. Ins., 503 So.2d 45, 45-46 (La.App. 5 Cir.1987) the Fifth Circuit stated:
The manifest error rule does not apply on appeal, where the trier of fact relies purely upon the written reports, records or depositions. We stand in the same position with the trier of fact to assess credibility and weigh the medical evidence (citations omitted).
The Supreme Court, however, reversed the Fifth Circuit stating:
The court of appeal erred in holding that the manifest error standard of appellate review does not apply when the evidence before the trier of fact consists solely of written reports, records and depositions. The court further erred in assessing credibility and weighing medical evidence as if the court of appeal were the trier of fact.
The manifest error standard and its purpose were stated succinctly in Canter v. Koehring Co., 283 So.2d 716 (La.1973), as follows:
119 ... the reviewing court must give great weight to factual conclusions of the trier of fact; ... and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based ... upon the proper allocation of trial and appellate functions between the respective courts.
Louisiana’s three-tiered court system allocates the fact finding function to the trial courts. Because of that allocation of function, ... great deference is accorded to the trial court’s factual findings and (they) should not be disturbed on appellate review of the trial court’s judgment.
Virgil v. Amer. Guar. and Liab. Ins., 507 So.2d 825, 826 (La.1987).
Thus the Supreme Court held that even where the trier of fact does not view the live witnesses, the manifest error standard still applies on appeal, not because of viewing witnesses, but because of the allocation of function within the court system.
Second, the defendants are bound by their stipulation. They cannot stipulate to allow the judge to review the written record in lieu of a new trial and then attack his judgment because he only reviewed a written record. Stipulations would then have no viability.
Thirdly, we have both applied the manifest error standard and we have made our own independent de novo review upon the written record, as did the second trial judge, and not only do we find no error, but we agree with his findings. Thus whether we apply the manifest error standard or de novo review, we find no error on the trial judges part. This assignment of error is without merit.

DOTD’s Second Assignment of Error

DOTD argues that the trial court erred in finding the highway defective and the DOTD at fault in causing the accident. By LSA-R.S. 48:35, the State has adopted the approved standards of the American Association of State Highway and ^Transportation Officials (AASHTO) as its standards. The AASHTO publication A Policy on Geometric Design of Rural Highivays 1966 was admitted in its entirety as St. Bernard’s Exhibit 1. Parts of the update A Policy on Geometric Design of Rural Highways 1981 was admitted as a DOTD exhibit. In the 1965 edition, AASHTO recommends 12 foot wide shoulders on high speed highways. In the 1984 edition provides the following discussion of shoulders:
Well-designed and properly maintained shoulders are necessary on rural highways with an appreciable volume of traffic, on freeways, and on some types of urban highways. Their more important advantages are as follows:
*1150 1. Space is provided for stopping free of the traffic lane because of mechanical difficulty, a flat tire, or other emergency.
2. Space is provided for the occasional motorist who desires to stop to consult road maps, to rest, or for other reason.
3. Space is provided to escape potential accidents or reduce their severity ...
DOTD argues that in order to find DOTD responsible for a defective condition of the highway, the plaintiffs had to prove that:
1. the DOTD owned or had custody of the thing which caused the damage;
2. the thing was defective in that it created an unreasonable risk of harm to others;
3. the DOTD had actual or constructive knowledge of the defect or risk of harm, but failed to take corrective action within a reasonable time; and
4. causation.
Turning to number one, DOTD builds and possesses highways on behalf of the State.
Turning to number two, the construction of the highway was defective in that the negative cross-slope caused water to accumulate or puddle upon the highway. The trial court further noted that although this was a new highway, it was defective in that it already had ruts and holes. Those ruts, holes and patches are easily seen on the photograph 2 in Plaintiffs’ Exhibit 77. Expert Roy hiAnderson, former Traffic and Highway Safety Engineer for the National Transportation Safety Board, found that the asphaltic concrete mix used in the highway did not meet the specifications of the highway plan and that is the reason for the excessive wearing and rapid deterioration of the highway and the cause of the ruts which held water and caused this accident and Michael Shepard’s death. DOTD could have filed third-party claims and brought into this lawsuit the designers, contractors and cement supplier who built this defective highway and used rapidly deteriorating substandard materials. In that case, the people who profited financially from the substandard materials would be bearing the loss and not DOTD and the State. DOTD, however, failed to file third-party demands.
Turning to number three, DOTD regularly inspected the highway, but only in fair weather conditions. The trial judge correctly noted that DOTD cannot argue that it has no knowledge that a highway holds water when it fails to conduct inspections during rain. The trial judge cited Fox, supra, for the proposition that a public body cannot hide behind the notice requirement to escape liability by failing to perform inspections under circumstances which would reveal the dangerous conditions. The trial court correctly found that DOTD has a duty to inspect highways during rainfalls, citing McCullin, supra at 834, which held that the State has a duty to have an efficient and continuous inspection system which duty is a corollary of its duty to maintain its highways.
Lastly, the trial judge found causation. Specifically he found that the negative cross-slope caused standing water upon the highway. When the side wheels of the pick up truck came into contact with the puddle it created a phenomenon known as differential drag which caused the vehicle to spin clockwise. Thus the defect in the highway under the custody and control ofj^DOTD was the direct cause of the accident. We find, as did the trial judge, that under a duty-risk analysis DOTD is liable.

St. Bernard’s Assignment Two:

St. Bernard argues that the location of its yard was not causally related to the accident. The photographs of the area around the maintenance yard indicate that the area is undeveloped. Other than the maintenance yard and what appears to be a gas station a block away, there is nothing but trees and vegetation on all sides and behind the yard for large distances. There are, for example, no other buildings or structures which would have prevented the Parish from building further back from the road. If the maintenance yard had not been constructed on the state right-of-way clear zone, but rather had been constructed further back in accordance with AASHTO standards, then the Parish would not have been using the shoulder of the roadway as an employee parking lot, the truck would not have been on the *1151 shoulder of the roadway and the spinning Scheeler vehicle would not have collided with it. The experts testified that there probably would have been no collision with the dump truck if the dump truck had been located a mere six or more feet farther from the edge of the highway. As noted before, the driver had been instructed to pick up his workers at that location. If the maintenance yard had been 90 feet further back, then the shelled employee parking area would have been 90 feet further back, the dump truck would have been waiting in the shelled area 90 feet further back from the roadway and the Scheeler vehicle would not have collided with the dump truck. Thus we agree with the trial court’s finding that the presence of the Maintenance Yard in the recovery zone caused or contributed to the collision and deprived the driver of an opportunity to regain |23Control of his vehicle, thus the encroachment was a contributing causative factor of the accident.
Applying a duty-risk analysis to the St. Bernard Parish Police Jury, first, St. Bernard constructed, owned, and had custody and control of the maintenance yard, the shelled area they used as a parking area and the dump truck. Second, the construction of the yard and shelled parking area within in the highway clear zone, as well as the placement of the dump truck created an unreasonable risk of harm to others by blocking and defeating the entire purpose of highway clear zones. Third, St. Bernard had actual knowledge of the defective location of its maintenance yard and shell employee parking lot on the highway right-of-way clear zone, because they constructed it themselves, but failed to take corrective action by moving the ■ yard and lot out of the clear zone within a reasonable time. Fourth, the trial judge found that while the negative cross-slope puddling and differential drag caused the truck to spin, if the dump truck had not been parked in the clear zone, as per the instructions to the dump truck driver, the fatal truck and dump truck collision would not have occurred. Thus causation was established and under a duty-risk analysis, the St. Bernard Parish Police Jury is liable.

Both Defendants’Assignment Three:

Both D0TE) and gt Bernard argue that the trial court erred in allocating Irds of the ⅛⅛ to DOTD and Jérd of the fault to St. Bernard. DOTD argues that Scheeler should be 80% liable, DOTD 10% liable and St. Bernard 10% liable. St. Bernard argues that it should be 0% liable, or in the alternative, Scheeler and DOTD should be primarily liable for most of the fault, with the Parish secondarily liable for a small percentage of fault. Plaintiffs state “... the apportionment of fault between the two governmental agencies made parties to this case does not ^matter to the appellees, so long as the Police Jury is not found to have been wholly at fault.”
In the instant case, DOTD was responsible for the construction of the highway. DOTD allowed the use of substandard materials, they built a highway with negative cross-slope creating puddling, they built a highway which rapidly developed ruts and fracture wearing on the roadbed caused by the substandard materials and they built a highway which holds water in a rainstorm beyond the AASHTO standards. For all of this negligence, one-third fault does not seem unreasonable.
The St. Bernard Parish Police Jury constructed its Maintenance Yard in the highway clear zone, put up a fence, put down shells between the fence and the roadway to create an employee parking lot and regularly and routinely instructed its employees to use the clear zone for parking and loading passengers. One-third fault is reasonable for DOTD’s negligent design and construction of the highway.
Lastly, DOTD is responsible for the maintenance of the highway and the maintenance of the clear zone. On the issue of highway maintenance, DOTD did not repair the ruts and fracture wearing on the roadbed caused by the substandard materials and they did not inspect the highways in the rain to see if the highway holds water in a rainstorm.
On the issue of clear zone maintenance, DOTD has the primary duty to enforce its right-of-way, to enforce its clear zone and to maintain the integrity of the highway shoul *1152 der. DOTD routinely inspected the highway and thus knew that the Maintenance Yard was encroaching upon the clear zone. DOTD had the power and the duty to require the Area 5 Yard to be moved from within the clear zone. DOTD did not do anything to clear the obstruction of the clear zone. The |25Purpose of the clear zone is to provide protection from the very risk that was realized in this accident. One-third fault is reasonable for DOTD’s negligent maintenance.
Accordingly, we affirm the trial court’s allocation of fault.

St. Bernard’s Assignment Four:

The judgment renders the St. Bernard Parish Police Jury partially liable for the claims of its employees Couture and Rossig-nol. Couture and Rossignol vis-a-vis their employer St. Bernard were limited to the exclusive remedy of worker’s compensation. Accordingly, the judgment will be amended to so reflect.
For the reasons discussed, the judgment of the district court is amended as follows and as amended, is affirmed:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein on the issue of liability in favor of the plaintiffs Wallace Couture and Roland Rossignol and intervenors, Louisiana Insurance Guaranty Association and St. Bernard Parish Police Jury against the defendant, the State of Louisiana through the Department of Transportation and Development.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein on the issue of liability in favor of the plaintiffs Alfred Scheeler and Mr. and Mrs. Michael Shephard and against the defendants, St. Bernard Parish Police Jury and the State of Louisiana through the Department of Transportation and Development, and that the liability of those defendants be apportioned in the amounts of:
State DOTD 66¾%
St. Bernard Parish Police Jury 33⅝%

AMENDED & AFFIRMED.

. This Court did not hear the testimony of any of the witnesses. Therefore, it is unable to make credibility determinations based upon the witness’ unreported demeanor on the witness stand or the witness’ voice inflections. This Court will thus need to be more sensitive to the other credibility assessment factors that will indicate which witnesses to believe. Those factors will be, among others, the overall reasonableness of a witness' testimony, the manner in which his testimony fits in with and is corroborated or refuted by other testimony, the witness’ statements or testimony on different occasions, and the witnesses’ biases or interests in favor of or against a particular party or group of parties in this action.

. The evidence shows that the property expropriated for the right-of-way of the highway was much in excess of the clear zone requirements published in the AASHTO Manual, viz., 30' from the edge of the shoulder. In fact, the expropriation was sufficient to permit the construction of the E.J. Gore Pumping Station on the north side of the right-of-way near the curve and to reserve an additional 90' for the exclusive use of the State DOTD's purposes implicit in expropriating a right-of-way. Notwithstanding the reservation of the 90' strip for right-of-way purposes, the St. Bernard Parish Police Jury constructed its Maintenance Area No. 5 equipment yard on the side of the highway, the fence of which was located 31' from the edge of the shoulder. If the parish yard had been situated in a straight section of the roadway, the clear zone would have been adequate. But it was situated less than 350' from the end of a curve. Mr. Roy Anderson, an eminent civil engineer who has been employed by the National Transportation Safety Board and worked in connection with matters involving the clear zone and interpreting the requirements therefor in connection with highway safety, testified that the clear zone would be represented in a turn by an imaginary line drawn from a point 30' from the edge of the roadway tangent to the arc of the curve to a point 30' from the edge of the roadway at a distance of 350' beyond the end of the curve. The yard was situated only 200' from the end of the curve, leaving a distance of *1138 150' additional feet for the clear zone expansion beyond the base 30' dimension. The entire front of Area 5 Yard was situated within the clear zone.

.A "clear zone” is an area beside a roadway which is kept clear for vehicles which inadvertently leave the highway in order to permit the driver to recover control of the vehicle and avoid or minimize risk of property damage or personal injury in a collision with something occupying the clear zone. See Nicks v. Teche Electric Co-op, Inc., No. 93-1418 (La.App. 3 Cir. 6/1/94), 640 So.2d 723, 726 (La.App. 3 Cir.1994); Oster v. DOTD, 582 So.2d 1285 (La.1991).

. "JTPA” stands for the "Jobs Training Partnership Act,” a federally funded program within the federal Comprehensive Employment Training Act (CETA) program.

. Five separate suits were filed with regard to the accident in this case. They were subsequently consolidated for trial and other purposes in Division A of this Court.

. See, e.g., Exhibits P-22, P-48, P-50, P-52.

. Mr. Scheeler's perception that the parish truck’s wheels were in the right travel lane may have resulted from his impression that the entire asphaltic paved area of the roadway was the travel portion of the highway, rather than a two-lane highway with an asphalt-improved shoulder; or, it may have been based upon his momentary view of the truck as his pickup truck spun around to reveal its presence immediately in front of him under circumstances where he might have noticed that the vehicle's tires were partially on the paved portion of the roadway. Either of those views of Scheeler’s testimony reconciles his testimony with that of the other evidence showing that the parish truck was not parked in the travel lane but partially on the right shoulder of the road and partially on a shell-improved extension of the shoulder between the edge of the asphalt and the fence surrounding the parish's maintenance yard. It is significant to note that photographs taken from the driver's perspective in the direction of travel of the Seheeler vehicle do not reflect the highway marking where they are covered by water. See, e.g., Exhibit P-50. Although the fog line is visible on Exhibit P-50, that photograph was taken during the accident investigation, after the puddle which affected the Seheeler vehicles had drained or otherwise been dissipated. The evidence shows that the right travel lane was holding water at the time of the accident.

. The evidence establishes that the Seheeler vehicle went into a spin about 200' from the point of impact with the trash truck.

. This Court is of the belief that the flashers were illuminated. Mr. Couture testified that he turned them on while he waited for the two men to come to the truck. Mr. Rossignol testified that he observed the front flashers working as he approached the truck prior to the collision. There is no positive testimony which contradicts that testimony showing that the flashers were activated prior to the accident. Mr. Scheeler did not contradict Mr. Couture’s and Rossignol’s testimony.

. Scheeler testified that he was still having to use his windshield wipers on their highest setting as he entered the curve.

. Other drivers were traveling about the same speed, perhaps only a few miles per hour slower than the Scheeler vehicles. All of the experts agree that speed was not a causative factor in the accident in this case. Therefore, this Court will not dwell on the testimony of the witnesses relative to the speed of the various vehicles other than to note that the speed was not unreasonably dangerous under the circumstances, especially when Dr. Blaschlce, the State's expert traffic engineer, testified that the roadway should have held the pickup truck at speeds approximately 90 miles per hour even when wet.

.It is obvious that the plea of the minor was accepted under the terms stated by his trial counsel, who also represented him during the juvenile traffic court proceedings. If the plea had not been accepted in the manner represented by the minor's trial counsel, the defendants would have been able, under Article 412(A)(3), La.Ch.C., to obtain and file a certified copy of the plea in evidence. That they did not do so suggests, as Scheeler’s counsel represented, that the records were sealed. Moreover, the proceedings during the trial, when the Courtroom Deputy Clerk referred to the record as being in her possession and included within the defendants' proffer, show that the record was then treated as if sealed by prior court order. That record was sealed and was not viewed by Judge McBride, so it will not be reviewed by me. Sealing the records had but one purpose, viz., to prevent their use for the purpose defendants sought to offer them pursuant to the agreement made in connection with the entry and acceptance of the plea in the juvenile traffic proceedings. By whatever name such an agreement may be called in a juvenile proceeding, the rationale for excluding nolo contendere pleas in civil proceedings justified the exclusion of the testimony concerning the plea entered by the minor in the traffic proceedings based on the minor's operation of the *1141 pickup truck on the occasion with which this trial was concerned.

. The experts contradicted each other with regard to whether there were "ruts” in the roadway sufficient to cause water which would jerk one of the wheels when the tires struck the puddled water, but there was no testimony disputing the existence of low spots on the surface which would have accumulated water. For a roadway as new as this one was at the time of this accident, it was in a deplorable condition. By whatever nomenclature one would apply to the worn surface of that new highway, i.e., ruts, groves, low spots, etc., this Court is convinced that the roadway did hold water at the end of the curve which presented an unreasonable risk of harm to drivers which caused the Scheeler vehicle to go out of control when Scheeler drove into the puddle of water standing on the highway.

. If the impact had been more from the side, the rear end of the trash truck would have been knocked toward the fence, the front of the trash truck would have then been pointed toward the roadway, and the amount of energy transferred to the trash truck along its front-to-rear axis would have been diminished so that the truck would not have rolled as far as it did. Once the Scheeler vehicle went into a spin, it traveled in a relatively straight line from the point of loss of control at the end of the curve to the point of impact with the trash truck. That is, it more or less "straightened out the curve" once the pickup truck became out of control.

. There is much argument and testimony regarding the claim that Seheeler had begun his turn into the left lane and oversteered, causing himself to lose control of his vehicle. That clearly was not the cause of this accident because a left steering input would have caused the vehicle to spin in a counterclockwise direction, opposite to that which each of the experts testified the Seheeler vehicle spun.

. Matthew Shephard was killed in the accident.

.King stated: "... the highway was wet. There was water on the pavement.” This Court believes, and so concludes, that King’s statement meant that the roadway was generally wet from the rain and that there were puddles of standing water on the highway. There is no reason for him to have meant the same thing when he made two different statements describing the wetness of the roadway, i.e., "wet” and "water on the pavement,” practically in the same breath.

. The described circumstances are consistent with the grooving of the highway surface which would have added depth to the accumulation of water at that point and would have increased the resistance to the tires pushing that amount of water aside as the tires rolled through the groove.

. Mr. Anderson and Mr. Boyd Gautreaux both testified that filling worn spots on the roadway were operational aspects which would be categorized as "maintenance" of the highway. Mr. Anderson testified that the low spots could have been filled with asphalt or that signs could have been installed to warn of such a hazardous condition existing at the end of the curve during inclement weather.