NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 11-971

NORMAN FRUGE, ET AL.

VERSUS

STATE OF LOUISIANA, DOTD, ET AL.

CONSOLIDATED WITH CA 11-972

JAMES LEJEUNE, ET AL.

VERSUS

STATE OF LOUISIANA, DOTD, ET AL.

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. 2002-0309 C/W 2002-0311
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Shannon J. Gremillion, Judges.

AFFIRMED.

**Gary J. Arsenault**
**Neblett, Beard & Arsenault**
**P. O. Box 1190**
**Alexandria, LA 71309**
**(318) 487-9874**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Norman Fruge**
    **Shannon Reschly**
    **Cynthia House**
    **James Lejeune**


**Michael Wayne Landry**
**Assistant Attorney General**
**One Lakeshore Drive, Suite 1200**
**Lake Charles, LA 70629**
**(337) 491-2880**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **State of Louisiana, Department of Transportation & Development**

PETERS, J.

These consolidated wrongful death actions arise from an April 15, 2001 two-vehicle accident that occurred in Beauregard Parish on United States Highway 171 (Highway 171), near its intersection with Lee Hall Road. Geraldine Fruge and her eight-year-old granddaughter, Hannah Lejeune, were killed in the accident. The plaintiffs in these consolidated cases sought to recover damages from, among others, the State of Louisiana, Department of Transportation and Development (DOTD). A jury verdict resulted in the rejection of their claims against DOTD. After the trial court executed a judgment conforming to the jury's verdict, the plaintiffs perfected this appeal. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The accident giving rise to this litigation occurred at approximately 5:30 p.m. on April 15, 2001. Immediately before the accident, Geraldine Fruge was driving her 1998 Pontiac Grand Prix in a southerly direction on Highway 171, which was a two-lane highway at the time of the accident.[1] Mrs. Fruge's vehicle was third or fourth in a line of four or five other vehicles. At some point, she lost control of her vehicle, entered the north-bound lane, and struck a Ford F-150 pickup truck being driven by Dean Clinton Norwood. Both Mrs. Fruge and her granddaughter died from the injuries they sustained in the collision.

Norman Fruge, Mrs. Fruge's husband, and James Lejeune, Hannah's father, both filed separate suits against DOTD and the Beauregard Parish Police Jury, with each plaintiff asserting both a wrongful death action under La.Civ.Code art. 2315.2 and a survival action pursuant to La.Civ.Code art. 2315.1. The trial court consolidated these two suits for trial. At a later time, Shannon Reschly, Hannah's mother and Mrs. Fruge's daughter, intervened in both suits seeking to recover both

---

[1]Before trial, the highway had been expanded to a four-lane highway.

wrongful death and survival action damages as well. She was joined in intervention into Mr. Fruge's suit by her sister, Cynthia House. For the purpose of this opinion, both the initial plaintiffs and the intervenors will be collectively referred to as "the plaintiffs."

The plaintiffs dismissed the Beauregard Parish Police Jury as a party defendant before trial. Thus, when the two consolidated suits came to trial, the only remaining defendant was DOTD. Additionally, during the trial, the plaintiffs dismissed their survival actions.

At the close of the six-day trial, the jury returned a verdict finding no fault on the part of DOTD in causing the April 15, 2001 accident. After the trial court reduced the jury's verdict to a written judgment, and after the trial court rejected the plaintiffs' motions for judgment notwithstanding the verdict and motions for new trial, the plaintiffs perfected the appeal now before us. In their sole assignment of error, the plaintiffs assert that "[t]he Jury erred in finding the rutted portion of U.S. Hwy. 171 that was maintained by [the] Louisiana Department of Transportation & Development and filled with water on the day of the accident did not proximately cause Plaintiffs' damages and that the DOTD did not engage in substandard conduct in their failure to repair the admitted defective condition."

**OPINION**

In a tort action against DOTD the plaintiff must show: (1) the property that caused the damage was in DOTD's custody, (2) the property had a condition that created an unreasonable risk of harm and therefore was defective, (3) DOTD had actual or constructive notice of the risk, and (4) the property's defect was a cause-in-fact of the plaintiff's injuries. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. The analysis is the same, regardless of whether the plaintiff is proceeding under a theory of strict liability or negligence. *Id*. DOTD's duty is to "maintain the public

2

highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence." *Id.* at 799.

Of the four elements required to be proven by the plaintiffs, the second and fourth are the primary two at issue in this appeal. Thus, we begin our review with the second element: whether Highway 171 contained a condition that created an unreasonable risk of harm. In considering this element, we first recognize that DOTD is not a guarantor of the safety of those who travel the highways of this state. *Ryland v. Liberty Lloyds Ins. Co.*, 93-1712 (La. 1/14/94), 630 So.2d 1289. DOTD's duty to the traveling public is breached only when the highway at the scene of the accident is found to be in an unreasonably dangerous condition. *Id.* DOTD's duty to maintain reasonably safe roadways encompasses persons who are foreseeably placed in danger by unreasonably dangerous conditions. *Id.* Under our comparative negligence system, even motorists who are slightly exceeding the speed limit, momentarily inattentive, or otherwise negligent may recover from DOTD. *Lamaire v. Motor Convoy, Inc.*, 625 So.2d 638 (La.App. 3 Cir. 1993), *writ denied*, 93-2778 (La. 1/7/94), 632 So.2d 754. "Whether DOTD breached its duty, that is, whether the roadway at the scene of the accident was in an unreasonably dangerous condition, will depend on the facts and circumstances of the case." *Cormier v. Comeaux*, 98-2378, pp. 6-7 (La. 7/7/99), 748 So.2d 1123, 1127.

The jury found that Highway 171 did not contain a defect that created an unreasonable risk of harm to Mrs. Fruge and her granddaughter. The jury's determination in this regard is factual in nature, and we evaluate findings of the trier of fact under the manifest error or clearly wrong standard. *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Stobart v. State, Through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the jury's finding. *Rosell*, 549 So.2d 840. The reviewing court must review the record in its entirety to

determine whether the jury's finding was clearly wrong or manifestly erroneous. *Id.* The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Cosse v. Allen-Bradley Co.*, 601 So.2d 1349 (La.1992). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Rosell*, 549 So.2d 840; *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978).

Proper deference to the manifest error rule protects a litigant, plaintiff or defendant, from being subjected to multiple trials by preventing the appellate courts from reevaluating and reweighing the evidence to reach an independent decision without giving due deference to the trial court's function. *Updegraff v. State ex rel. Dep't of Transp. and Dev.*, 01-1048, p.6 (La.App. 4 Cir. 10/2/02), 828 So.2d 693, 699, *writs denied*, 02-2909, 02-2916 (La. 2/7/03), 836 So.2d 103, 105. With this reminder of our function, we turn to the evaluation of the facts addressing the second element of the duty-risk analysis.

With regard to the specific mechanics of the accident itself, the jury heard the testimony of eyewitnesses, investigators, and expert witnesses. One of the eyewitnesses was Melissa Renee Hicks Kibodeaux, a passenger in the front seat of her husband's pickup truck. Mrs. Kibodeaux testified that she and her husband were traveling north on Highway 171 at the time of the accident, and were situated immediately behind Mr. Norwood's truck. According to Mrs. Kibodeaux, it had been raining on and off that evening with periods of heavier rain.

Mrs. Kibodeaux testified that she observed a vehicle immediately in front of Mrs. Fruge's vehicle begin to slow down to make a right turn onto Lee Hall Road and observed Mrs. Fruge's vehicle begin to pass that vehicle. According to Mrs. Kibodeaux, as Mrs. Fruge's vehicle began to return to the southbound lane, it first

swerved back and forth and then began traveling in a straight line toward Mr. Norwood's truck. She observed Mr. Norwood turn to the right to unsuccessfully avoid the oncoming vehicle. Mrs. Kibodeaux testified that Mr. Norwood's truck "clipped" Mrs. Fruge's vehicle. The impact between the two vehicles caused Mrs. Fruge's vehicle to spin further out of control. It finally came to a stop facing east, and still in the northbound lane. Mr. Kibodeaux veered into the southbound lane to avoid hitting the two vehicles.

Mrs. Kibodeaux testified that each lane of the highway contained ridges or ripples in the travel portion normally traversed by vehicles, and that on the day of the accident these ridges or ripples held water on the road. It appeared to her that Mrs. Fruge's car was hydroplaning.

Mrs. Kibodeaux's husband, Colby, testified that although the hard rain had begun to slack off at the time and location of the accident, the travel ruts were still filled with water. In fact, he testified that he was driving on the right edge of the northbound lane to avoid the ruts. He observed Mrs. Fruge's vehicle spinning in a complete circle along the centerline of the highway, but did not see a vehicle attempting to make a right turn onto Lee Hall Road. He immediately engaged his brakes, veered to the left into the southbound lane, and drove around Mrs. Fruge's oncoming vehicle. According to Mr. Kibodeaux, the accident occurred slightly north of a flat area of the road.

Mr. Norwood testified that the weather had been stormy earlier, but at the time of the accident the rain had lightened up. According to Mr. Norwood, immediately before the accident occurred, his truck had begun to fishtail because of water on the highway, and after regaining control he engaged his seatbelt. When he next looked forward, he observed the oncoming traffic in the southbound lane and saw Mrs. Fruge's vehicle lift and start spinning out of control. As her car entered his lane of travel, he turned first to the right and then to the left in an attempt to avoid a collision.

5

He could not recall whether he engaged his brakes, but he maintained control of his truck. Unlike Mrs. Kibodeaux, he did not observe a right-turning vehicle in front of Mrs. Fruge's vehicle and did not know if she passed another vehicle before hitting him. He was sure, however, that at the time of impact he was in the northbound lane, and that Mrs. Fruge was in her own lane when he first saw her vehicle rise up and go out of control. According to Mr. Norwood, the first complete spin by the Fruge vehicle happened when she was in his lane of traffic. Mr. Norwood said that he did not know whether Mrs. Fruge's vehicle was in water or not, explaining that he did not remember if he saw any splashing of the water because the vehicle was coming right toward him. He was sure that at the time of the accident she was not in control. According to Mr. Norwood, Mrs. Fruge's vehicle made one or two spins in a clockwise direction before the driver's side struck his truck. Because his airbag deployed at impact, he saw nothing else thereafter.

Howard L. LaCaze, Jr., a twenty-eight year veteran police officer from Alexandria, Louisiana, investigated the accident at the request of the plaintiffs. In the Spring of 2011, he and Don Renniger, an Alexandria, Louisiana part-time private investigator, visited the accident scene for the purpose of measuring the depth of the ruts in the highway. Mr. LaCaze and Mr. Renniger measured the travel ruts in the southbound lane beginning at or near the point of impact, and every fifty feet thereafter for a distance of 400 feet. His measurements revealed that the depth varied from a maximum of nine-sixteenths of an inch to a minimum of one-fourth of an inch deep. The average depth seemed to be one-half of an inch with the outside rut being generally deeper than the inside.

With regard to the tendency of Highway 171 to hold water within the rutted areas of the travel lanes, two emergency responders testified that it was an ordinary occurrence. Victor Classen, a Broadlands Fire Department volunteer, and Eric Tyson Stracener, a DeRidder, Louisiana, employee of Acadian Ambulance Service, arrived

6

at the scene after the accident. Both men testified that there were ruts in the traveled portion of Highway 171 at the scene of the accident that would collect water, and Mr. Classen testified that he would sometimes drive on the side of the highway to avoid the accumulated water in the travel ruts after a heavy rain.

Louisiana State Trooper Freddie Rogers arrived at the scene of the accident approximately twenty minutes after receiving the call to respond. The photographs he took during his investigation that evening revealed that water had accumulated in the shallow depressions in the travel lanes of both the northbound and southbound lanes. As part of his investigation, he measured the tread depth on Mrs. Fruge's tires and found that the front tires had very little wear and appeared to be new. Both front tires had tread depths of ten thirty-seconds.[2] He found that the rear tires, however, had more wear. According to Trooper Rogers, the right rear tire measured at four thirty-seconds on all of the tire, while the left tire went from one thirty-second on the inner portion of the tire to three thirty-seconds in the middle of the tire and four thirty-seconds on the outer edge of the tire. Trooper Rogers testified that all four tires met legal specifications as the legal limit is two thirty-seconds of tread.

Trooper Rogers interviewed Mr. Norwood, who told him that Mrs. Fruge's vehicle had hydroplaned. Although Trooper Rogers initially testified that he agreed with that analysis, on cross-examination he acknowledged that when he used the term "hydroplaned," he did not necessarily mean the vehicle lost contact with the highway. Rather, he meant that the vehicle may have suffered a wet-weather skid. Trooper Rogers summarized his investigation on the accident report by noting that Mrs. Fruge was inattentive or distracted and exceeding the safe speed limit. However, he based these conclusions on the fact that Mrs. Fruge lost control of her vehicle and crossed into the oncoming lane of traffic, not on any accident reconstruction attempt on his

---

[2] Trooper Rogers testified that tire tread depths are measured in thirty-seconds of an inch.

part. In fact, Trooper Rogers made it clear in his testimony that he was not an accident reconstruction expert.

Given the lay testimony presented to the jury, it is clear that the jury could not have come to any conclusion other than the fact that the travel ruts on both lanes of Highway 171 were holding some water at the time of the accident. Thus, the pivotal question is whether this retention of water was a defect in the highway that created an unreasonable risk of harm. On this question, both sides presented expert testimony.

The trial court accepted Dr. John Charles Glennon, a Lenexa, Kansas, civil engineer, as an expert in highway safety, traffic engineering, highway maintenance, and highway design. Dr. Glennon testified for the plaintiffs and was of the opinion that the water retention in the travel ruts constituted a defect which created an unreasonable risk of harm. In reaching that conclusion, Dr. Glennon reviewed the police reports; numerous photographs of the scene; the measurements that had been taken by others; and the depositions of Mr. Norwood, Trooper Rogers, Mr. and Mrs. Kibodeaux, and two defense experts, Larry Douglas Peterson and Dr. Joseph David Blashke. Additionally, Dr. Glennon visited the accident scene on October 4, 2006, and performed his own investigation.

During his on-the-scene investigation, Dr. Glennon measured the depths of the ruts in the highway, the highway's cross-slope, and the highway's grade at fifty-foot intervals from where Mr. Norwood's truck came to a rest. He measured the depths of the ruts on the southbound lane and found that the ruts varied from two-tenths of an inch to six-tenths of an inch. According to Dr. Glennon, any depth over two-tenths of an inch would contribute to hydroplaning if it extends for a distance of thirty feet or more.

Dr. Glennon also explained that the rut depth is not the only factor affecting a vehicle's performance on a highway in the rain. According to Dr. Glennon, the highway's cross-slope, which is a measurement of how much the highway is sloped

from the centerpoint of the highway to its edge, is important in determining how a roadway will drain. In his expert opinion, a two to two-and-a-half percent slope is typical for draining a roadway, but on Highway 171, Dr. Glennon found that only one place he measured had at least a two percent cross-slope. In fact, he found that at many places the cross-slope measured as low as one and a quarter percent, and said that this inadequate cross-slope will contribute to the build-up of water on the grade. Although Dr. Glennon found that the southbound lane was on a fairly slight downgrade, starting at six-tenths of one percent at the spot four hundred feet from the truck's final resting place, at the truck's final resting place the grade was zero. That is to say, the highway was flat at that point.

In Dr. Glennon's opinion, the highway cross-slope was not sufficient to drain the highway and the excess water would drain down the grade of the highway instead of off the edge. In doing so, it would collect in the ruts until it reached the lowest part of the highway. Dr. Glennon also testified that if the travel ruts are deeper on one side than the other, one side of the vehicle will begin to hydroplane, causing it to begin turning sideways. According to Dr. Glennon, a heavy rain would deposit at least two-tenths of an inch of water into the ruts of Highway 171, creating the conditions for hydroplaning to occur.

Dr. Glennon testified that Louisiana does not have a specific standard with respect to ruts and when they should be filled or repaired although the state does require potholes to be leveled by hand when a depression is two inches deep or the water collects half an inch deep.

According to Dr. Glennon, tire tread plays a part in hydroplane causation. He testified that the standard widely used across the country, as well as in Louisiana, is that a tire that has less than two thirty-seconds of tread on two consecutive treads or grooves is an illegal tire. In comparison, Dr. Glennon stated that a new tire will have ten or twelve thirty-seconds of an inch of tread.

9

In summary, Dr. Glennon testified that the flooded ruts in the road, coupled with the low cross-slope and the downgrade, created a location where the probability of hydroplaning was significant. In his opinion, DOTD had the duty to identify this roadway as a problem area and repair it by filling in the ruts and/or roughing up the pavement. This defective condition, he opined, was a major contributor to the cause of the accident, and the accident would not have happened absent the travel ruts in the road. Dr. Glennon testified that with hydroplaning the vehicle's speed, the road's grade, the depth of the water, the tires, and the intensity of the rain are all factors. Other drivers travelling on the same road as Mrs. Fruge may not have lost control, perhaps because they had new tires, or they were driving outside of the ruts in the road, or they had not tapped their brakes, or they had not made a steering correction.

Stacy White, a Lake Charles, Louisiana, civil engineer, was accepted by the trial court as an expert maintenance engineer and testified for DOTD. In 2001, she was employed as DOTD's assistant maintenance engineer for an area that included Beauregard Parish. She testified that Highway 171 was under DOTD's control and supervision, and was inspected every two weeks by a superintendent. After the accident she sent Eddie Smith, Sr., a DOTD employee who reported to her, to investigate the accident scene and prepare a report. Mr. Smith measured both lanes of travel every twelve inches from the centerline to the edge of the highway in 100-foot intervals. The deepest reading he recorded was three-quarters of an inch, with a series of depressions at the 400-foot mark that varied from six-tenths of an inch on one side and thirty-six hundredths of an inch on the other. Based on Mr. Smith's report, Ms. White concluded there was very little rutting in this road.

Ms. White testified that contrary to Dr. Glennon's testimony, Louisiana does have a maintenance standard for ruts, and that the standard has been in place for the twenty-two years she has worked for DOTD. According to Ms. White, Louisiana requires that where there is a depression of more than one inch deep over ten feet, or a

depression where water ponds over half an inch deep, DOTD should consider doing maintenance work. However, if the depression exceeds two inches, maintenance work becomes a priority.

DOTD next called Mr. Peterson, a Warren, Michigan, mechanical engineer, and the trial court accepted him as an expert in accident reconstruction, vehicle dynamics, automotive engineering, and mechanical engineering. Mr. Peterson testified that he had reviewed all the depositions, the police report, the police photographs, the measurements others had made, the photographs of the measurements, the surveys, and construction information and drawings. He also inspected the site, but only after it had been rebuilt as a four-lane highway.

According to Mr. Peterson, hydroplaning is very rare and only occurs when one-tenth of an inch of water accumulates under tires and acts as a boundary layer separating the tires from the road. This one-tenth of an inch boundary layer must exist despite the condition of the tire treads, despite the aggregate on the road, despite the rain sipes in the tire, and despite the water being pushed out of the way as the tires travel through the standing water.[3] If, after all of the water that can be displaced by the vehicle in normal operation has been displaced, and if there is still at least one-tenth of an inch of water totally separating the tire from the road, hydroplaning can occur. According to Mr. Peterson, modern tires will fully handle the depths measured at this accident scene.

Mr. Peterson concluded that full hydroplaning did not occur in this accident, and that when Mrs. Fruge steered to the left and then steered back to the right the rear wheels of the car skidded out and the vehicle began turning clockwise. According to Mr. Peterson, this scenario is the only way to account for the position of Mrs. Fruge's vehicle at the time of impact with Mr. Norwood's truck. In fact, Mr. Peterson suggested that his opinion was supported by Trooper Rogers' measurements of Mrs.

---

[3] Mr. Peterson testified that "the angle cuts, little side cuts from your tire, they are called rain sipes."

11

Fruge's tire treads. According to Mr. Peterson, Mrs. Fruge's back tires, which had much less tread than the front tires, were not able to grab the highway as were the front tires, and the vehicle began rotating clockwise.

Dr. Blaschke, a College Station, Texas engineer who testified for DOTD, was accepted by the trial court as an expert in the fields of highway design, traffic engineering, and highway safety. Before reaching his conclusion that Highway 171 did not contain a defective condition that created an unreasonable risk of harm to Mrs. Fruge and her granddaughter, Dr. Blaschke reviewed most of the same material reviewed by the other experts who testified, including the accident report, the petition, Trooper Rogers' photographs, and the photographs taken by investigators. Additionally, he visited the accident scene and took more photographs.

Dr. Blaschke supported Mr. Peterson's assertion that hydroplaning is a very rare phenomena and asserted that it must be distinguished from the act of a vehicle slipping and sliding on wet pavement. According to Dr. Blaschke, an adequate amount of water and an adequate speed will cause a vehicle to lose traction and simply lie on top of the water with a complete inability to steer. Additionally, Dr. Blaschke testified that for hydroplaning to occur there would be splashing, which was not reported here. He also disagreed with Dr. Glennon's opinion that the pavement condition in the vicinity of the accident was unsafe. In his opinion, this was nothing more than a wet weather accident where there was loss of traction, but not to the point of hydroplaning.

Dr. Glennon testified on rebuttal that Mr. Peterson basically performed a reconstruction of the accident through his testimony while, at the same time, admitting that there was not sufficient evidence available to reconstruct the accident. He also disagreed with Mr. Peterson's expert conclusions because Mr. Peterson based his testimony on one assumption: that the westward movement of Mr. Norwood's pickup truck was due to the momentum of the car when the two collided. Dr. Glennon's

12

opinion was that this assumption was in conflict with Mr. Norwood's testimony that he had steered toward the shoulder to avoid the accident, which would account for the westward movement of the pickup truck.

While Dr. Glennon agreed that the regulations cited by Ms. White existed, he asserted that they applied to smaller indentations and ruts which would be leveled by hand. That being the case, he stood by his testimony concerning the lack of Louisiana regulations designed to address the hydroplaning issue.

With regard to Dr. Blaschke's testimony, Dr. Glennon noted that Dr. Blaschke testified that the road at the point of impact had no ruts in the surface. Dr. Glennon then pointed to photographs taken the day of the accident showing water-retaining ruts in the right side of the northbound lane at the point of impact. Dr. Glennon also disagreed with Dr. Blaschke's conclusion that the roadway was not unsafe, and repeated the factors which he had previously identified as making it unsafe.

With this evidence before it, the jury responded to the interrogatories propounded to it by answering "no" to the first question: "[d]id the defendant, State of Louisiana, Department of Transportation and Development, engage in substandard conduct which proximately caused plaintiffs' damages." By reaching this factual conclusion, the jury rejected the plaintiffs' claims for damages.

The jury was presented with conflicting factual testimony and conflicting expert opinions, and the record supports the jury's factual finding. That is to say, the evidence in the record provides a reasonable factual basis for the jury to have concluded that Highway 171 was not defective. We find no merit in the plaintiffs' assignment of error.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We assess all costs of this appeal to the plaintiffs, Norman Fruge, James Lejeune, Shannon Reschley, and Cynthia House.

**AFFIRMED.**